# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2833

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Southern |
| | * | District of Iowa. |
| Babatunde Nathaniel Beeks, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  December 14, 1999

Filed:  September 6, 2000

_____

Before McMILLIAN, JOHN R. GIBSON, and MAGILL, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Babatunde Beeks appeals from his conviction on one count of conspiracy to distribute crack cocaine.  He alleges that the district court erred in failing to grant him a new trial, to which he believes he was entitled on any of three grounds.  First, Beeks claims that his request for a mistrial should have been granted due to prosecutorial misconduct, which he alleges occurred when the prosecutor violated a pretrial ruling that he not attempt to impeach Beeks with a prior conviction without permission.  He further contends that the impeachment was itself improper because he did not testify.  Second, Beeks alleges that this same instance of prosecutorial misconduct, coupled

with a last minute production of letters from a testifying coconspirator that spoke of a plan among several coconspirators for getting Beeks convicted, resulted in a violation of his due process rights. Finally, he alleges that the government failed to introduce sufficient evidence to support his conviction. We are persuaded that the district court erred in refusing to grant a mistrial following the prosecutor's inappropriate inquiry on cross-examination of a defense witness, and that Beeks should be afforded a new trial.

The conspiracy was charged as existing from October 1997 to November 1998, within the Southern District of Iowa and elsewhere. Evidence of Beeks's involvement came primarily from eight other members of the conspiracy, all of whom had reached plea agreements with the government prior to his trial, but none of whom had been sentenced.[1] The crack cocaine that was distributed in the Des Moines area by members of the conspiracy came from Chicago, as did Beeks. In Des Moines, the "head guy" was Deryke Holton. The conspiracy was uncovered when Sean Lovelady began cooperating with the government in the summer of 1998, after Lovelady's car was stopped and found to have cocaine. Lovelady made a controlled payment to Holton, which led to Holton's eventual cooperation.

The testimony paints Beeks as Holton's sidekick, as the two were frequently in each other's company when drugs and/or money were changing hands. The government repeatedly asked several of the coconspirators to identify photographs that showed the two of them together, or that showed Beeks at Holton's house. While the government clearly used evidence of Beeks's association with Holton to bolster its case, it also called some witnesses who spoke of Beeks's own criminal conduct.

According to his coconspirators, Beeks's first acts in furtherance of the conspiracy occurred in November 1997. He was said to have traveled from Chicago

---

[1]One of the eight, John Norman, had been sentenced following jury conviction, but he later signed an agreement to cooperate with the government.

to Des Moines by bus carrying 18 ounces of crack and a bottle of "Super B," which he had learned to use in cooking powder cocaine to cause swelling or "blowing up" of the resulting crack. Craig Hunt testified that he began buying crack from Beeks during that same month for distribution in Des Moines. Hunt, who described Beeks as one of his Chicago sources, estimated that he bought crack from Beeks between ten and fifteen times over the next seven months. According to Corey Brown, Holton and Beeks began to supply him with crack in January 1988, which Brown then sold again. Daryl Saunders testified that he first got crack from Beeks in February 1998, with Beeks agreeing to "front" it, meaning that he gave Saunders the crack and allowed him to pay for it later. Saunders paid Beeks $2500 about a week later, after he had sold the two and a half ounces of crack. Saunders got three and a half ounces of crack from Beeks the next month, which was partially fronted for $1500, with Saunders paying Beeks an additional $2000 a week later.

Vanda Terrell was another of the individuals who brought crack from Chicago to Des Moines for distribution. Terrell testified that Beeks sometimes assisted in the transportation and that he also sold half a kilo of cocaine to Terrell in Chicago, which Terrell then converted to crack. Once in Des Moines, Terrell socialized with Beeks and others after they sold the crack they had brought.

The government presented no physical evidence of Beeks's involvement in the conspiracy, and none was discovered in a search that had been conducted of Holton's house. Similarly, the law enforcement witnesses who testified provided no evidence of Beeks's involvement in the conspiracy. Beeks presented several witnesses, including his mother and her husband. Among his witnesses was the human resources manager of Corporate Express Delivery Systems, where Beeks was employed from the end of July until early November 1998. Defense counsel elicited from this witness the dates of Beeks's employment, the position he held (driver), and the requirement of only a standard driver's license for the position. On cross-examination, the prosecutor asked

a series of questions about the job application form that appeared in Beeks's file, over defense counsel's objections.  The series concluded with the following exchange:

Q:      Now, in the background information of Mr. Beeks, do you ask if a person who's making application has a criminal record?

A:      Yes, we do.

Q:      And is that an important question that you take seriously at your company?

A:      Yes, we do.

Q:      If I mark this portion of the application Government's Exhibit 41, you specifically asked that question in the application; is that correct?

A:      That's correct.

Q:      And could you tell the Jury what the question is that you asked.

Defense counsel:        Objection, Your Honor, that's hearsay and beyond the scope of the direct examination.  Move to take the matter up outside the presence of the jury.

The Court:              Overruled.  You can do that when she's done.

Q:      What's the question that is on the application?

A:      "Have you ever been convicted of a felony or been involved as a defendant in a criminal proceeding in which the outcome has been anything other than acquittal or the dropping of charges?"

Q:      And how is the answer marked on that application?

Defense counsel:        Objection, that calls for hearsay, Your Honor.

-4-

The Court: Sustained.

The jury was then excused for the day, and defense counsel moved for a mistrial. The district court denied the motion, admonished the prosecutor not to make "any further reference to any criminal history," and told him "I want to know how we're going to get out of this."[2] With the agreement of the parties, the court excused the witness.

The following morning, defense counsel filed a written motion for a mistrial, which was again denied. Defense counsel then asked for a curative instruction, consisting of telling the jury that the answer to the prosecutor's last question would be "no," and that he had objected because the prosecutor improperly asked the question. The prosecutor opined that the question was not inappropriate, but that a curative measure would be to have the question and answer stricken and to admonish the jury to disregard it. The court ultimately instructed the jury that the answer to the prosecutor's last question was "no," and that he had excused the witness.

Another issue arose that morning. The prosecutor presented to the court and to defense counsel copies of two letters that had been intercepted by a Polk County Jail employee, given to the U.S. Marshals, and then turned over to him. Vanda Terrell had written the letters to individuals in Chicago, and the originals had been mailed from the Polk County Jail, where Terrell and the other witnesses were incarcerated. The letters spoke of a "plan" coming together as Beeks's trial began, a "winning team," and forming a "sole train line" (sic) on Beeks. Terrell wrote that he had yet to testify, but that he was ready with an obviously prepared answer as to what was promised to him in return for his cooperation.

---

[2]Along with these remarks, though, the district court told the prosecutor that he thought the reference was "innocuous on your part." In his order denying Beeks's Motion for New Trial and Motion for Judgment of Acquittal, the district court found no improper conduct on behalf of the government and, even if it had existed, the court found that Beeks did not suffer prejudice warranting a new trial.

Defense counsel affirmatively stated that he did not want a continuance to deal with the matter, but this was said when he was still arguing in favor of a mistrial, which he believed was further warranted by the potential collaboration between the witnesses. Following the court's continued denial of a mistrial, defense counsel stated that he would want to call some of the government's witnesses to inquire into their opportunity to discuss their testimony with each other. He then re-called Norman, McCarthren, Williamson, and Terrell. Each admitted having been housed or transported with other witnesses, but all of them denied having any substantive conversations about their trial testimony.

The jury returned a guilty verdict, and the district court denied Beeks's Motion for New Trial and Motion for Judgment of Acquittal. Beeks was later sentenced to 262 months.

I.

Beeks argues that he should have been granted a mistrial following the ultimate question the prosecutor posed to witness Perkins. He argues that the question was not proper under Rule 609 of the Federal Rules of Evidence, and that the question contravened the district court's pretrial ruling in limine that the prosecutor not inquire into a prior conviction without permission. We review the district court's denial of a defendant's motion for a mistrial for abuse of discretion. See United States v. Gladfelter, 168 F.3d 1078, 1082 (8th Cir.), cert. denied, 120 S. Ct. 205 (1999).

Beeks filed the motion in limine because the district court had yet to determine whether his only prior charge, one brought in Illinois, constituted a felony which may be used for impeachment, or whether it was more akin to a deferred judgment. The district court granted the motion, and the prosecutor indicated that he would seek reconsideration if Beeks testified. Beeks did not testify, and the prosecutor did not

seek reconsideration of the court's ruling before he asked Ms. Perkins about prior criminal proceedings.

Prosecutorial misconduct is grounds for a mistrial where (1) the prosecutor's remarks are improper, and (2) the remarks prejudicially affect the defendant's substantial rights so as to deprive the defendant of a fair trial. See United States v. Hernandez, 779 F.2d 456, 458 (8th Cir. 1985). In order to determine whether the defendant was deprived of a fair trial, we consider three factors. First, we consider the cumulative effect of the misconduct. Second, we examine the strength of the properly admitted evidence of the defendant's guilt. Last, we review the curative actions taken by the district court. See id. at 460.

We are convinced that the prosecutor's remarks were improper. The Assistant United States Attorney commenced cross-examination of the witness by ascertaining that she had brought a file, which he then took from her. His first question dealt with the period of time that Beeks worked, and he next asked if Beeks had filled out an application. The witness answered that Beeks had completed an application and, at counsel's request, pointed it out to him. Counsel handed the file back to the witness and particularly called her attention to the application. At that point Beeks's counsel objected that the questioning was beyond the scope of direct examination which had been limited solely to the dates of employment. The court allowed the AUSA to ask if she had relied on the file during her testimony to ascertain dates of Beeks's employment with the company, and if the record was kept in order to obtain such knowledge. She confirmed that the file allowed her to testify under oath with certainty. The court then denied the repeated objection.

The witness was asked to separate the application from the file. Perkins testified that July 20, the date listed on the application, was the date Beeks completed it. Perkins agreed that Beeks had been asked to produce a drivers license and that a copy of it was kept in the file. The AUSA asked about the address on the drivers license and

established that it was different from the address listed on the application. The witness denied that the address was verified and stated that the company did not have a customary practice of doing so because people change addresses quite often. The prosecutor then asked the questions which we quoted earlier in this opinion at pages 4-5.

In asking the witness to read the question and Beeks's answer, the prosecutor's evident purpose was to impugn Beeks's credibility and to improperly convey to the jury that Beeks had some past criminal involvement. He attempted to obtain the effect of impeachment even though Beeks did not testify. We are not persuaded by the government's argument that the negative answer abrogated any harm that might have arisen from the question itself.[3] Rather, "the negative response heightens the truth imputed in the asking of the question by the respected public official." Gross v. United States, 394 F.2d 216, 221 (8th Cir. 1968).

At oral argument, the prosecutor acknowledged that the district court had told him to get further direction before asking about Beeks's prior conviction. He argued that he had not attempted to get into Beeks's criminal history, but that he had merely asked a question about his employment history. The record does not support this facile explanation. It is evident that the examination by the AUSA was a careful and methodical exercise beginning with the file Perkins produced, including the application,

---

[3]The negative answer is relevant to Beeks's argument that the question was also improper under Rule 609 of the Federal Rules of Evidence. A defendant's prior convictions are admissible only if they fall within the parameters of the rule, and only if a defendant testifies, see United States v. Riley, 684 F.2d 542, 545 (8th Cir. 1982). As we have pointed out, Beeks did not testify and thus he was not subject to impeachment. Moreover, although the question was improper, it did not elicit testimony that Beeks had a prior conviction.

Rule 609 is not implicated. The question was intended to elicit character evidence, and thus is more properly the subject of an objection under Rule 404(b).

and proceeding step by step to reach the critical inquiry concerning the question on the application about Beeks's criminal record.  The examination is indeed a classic example of a step by step creation of anticipation and curiosity, culminating in the question that would bring before the jury the existence of a criminal record.  When the climactic question was asked ("And how is the answer marked on that application?"), defense counsel's objection was sustained and the court thereafter adjourned for the afternoon.

The series of questions was intended to focus the jury's attention on Beeks's prior criminal charges and to impress upon them the seriousness of the issue.  The implication is that Beeks had a prior conviction, and that he lied to his employer about it.  The Assistant United States Attorney, as representative of the government at trial, used the question to "waft an unwarranted innuendo into the jury box," United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir. 1985), and the conduct is even more egregious because the prosecutor had been told to avoid any such references.  We admonish the Assistant United States Attorney for ignoring the ruling and jeopardizing the completion of a trial that was close to submission.  See United States v. Krapp, 815 F.2d 1183, 1186 (8th Cir. 1987).

We must consider the factors set forth in Hernandez to determine whether the misconduct prejudicially affected Beeks's substantial rights so as to deprive him of a fair trial.  The first such factor is the cumulative effect of the misconduct.  We recognize that this is not a case with repeated instances of impropriety.  "However, a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." United States v. Johnson, 968 F.2d 768, 771 (8th Cir. 1992) (internal quotations omitted).  When we consider the second factor, the strength of the properly admitted evidence of Beeks's guilt, we are persuaded that reversal is mandated.

As has already been demonstrated, virtually all of the evidence of Beeks's guilt came from coconspirators who had entered into plea agreements but had yet to be

sentenced. Some of those witnesses testified that they had not mentioned Beeks's name to investigators until after they had made deals with the government. Vanda Terrell, who wrote not only the letters introduced at trial, but also "thousands" of others during his seven months of incarceration, acknowledged that he did not name Beeks in any of those letters. The interception of the letters, which spoke of a plan to get Beeks convicted, supported the theory that the coconspirators had concocted such a plan when they were housed together.

Although those who testified about the letters denied being a part of any such plan, its existence is supported by the discrepancy between some of the witnesses' actual testimony and what the government anticipated their testimony would be. As Beeks points out, the government's trial brief set forth the anticipated testimony that would implicate Beeks, but several of the witnesses actually testified to his greater and earlier involvement. Moreover, the law enforcement witnesses who testified spoke of the conspiracy itself, but none provided evidence of Beeks's involvement. The government presented no physical evidence, through any witness, that Beeks was a member of the conspiracy.

Considered together, these elements indicate that the government's case against Beeks was not strong. Certainly, there was sufficient evidence to sustain Beeks's conviction, but it was substantially bolstered by the prosecutor's inappropriate questioning. As it is, the prosecutor posed an improper series of questions and the evidence was not "so overwhelming that the court's error in permitting the improper comments to stand was harmless beyond a reasonable doubt." United States v. Cannon, 88 F.3d 1495, 1503 (8th Cir. 1996); see also Johnson, 968 F.2d at 772.

We mention the final factor, the curative action taken by the court, although it is of no import in this case. The district court did not give the curative instruction urged by Beeks, but Beeks has waived his right to argue on appeal that it should have been given. In the hearing before the district court on his motion for new trial, Beeks's

counsel stated that "we will not contend -- the Court's curative instruction was the proper instruction, and we would -- we are not arguing about that."[4] Waiver means that Beeks is entitled to no review on this issue, even for plain error. See United States v. Mathison, 157 F.3d 541, 545-46 (8th Cir. 1998), cert. denied, 525 U.S. 1089 (1999); United States v. Dunnaway, 88 F.3d 617, 618 (8th Cir. 1996).

We conclude that reversal is warranted because the prosecutor pursued a line of inquiry that was improper, which deprived Beeks of a fair trial. Although the misconduct was not repeated and Beeks has waived any argument as to the district court's curative actions, we are led to this conclusion by the marginal evidence against Beeks coupled with the gravity of the infraction. The following passage was written by Wigmore in the context of cross-examination of a character witness with questions about a defendant's prior bad acts; however, it applies with equal force in this situation:

> This method of inquiry or cross-examination is frequently resorted to by counsel for the very purpose of injuring by indirection a character which they are forbidden directly to attack in that way; they rely upon the mere putting of the question (not caring that it is answered negatively) to convey their covert insinuation. The value of the inquiry for testing purposes is often so small and the opportunities of its abuse by underhand ways are so great that the practice may amount to little more than a mere

[4]We do not understand what counsel meant by this comment, because the district court said the following to the jury, which we do not consider curative:

> Ladies and gentlemen, yesterday when we adjourned for the day, . . . a Corporate Express executive, was on the stand. At that time the prosecutor had asked the question of whether or not Mr. Beeks indicated on his employment application if he had ever been convicted of a felony or any other crime. . . . At that point the defendant's attorney objected, and if you'll recall, the Court called a side-bar with the lawyers. The Court now instructs you that the answer to [the prosecutor's] question was "No," and I then excused the witness.

subterfuge, and should be strictly supervised by forbidding it to counsel who do not use it in good faith.

3A John Henry Wigmore, Evidence in Trials at Common Law § 988 (James H. Chadbourn rev. 1970). It appears that the government did not have a good faith basis for the question, as the district court had directed the prosecutor not to inquire into Beeks's criminal history and no one knew whether the Illinois charge was a felony conviction. The prosecutor knew that the answer written on the application was "no," and the only plausible reason for him to ask the question was to suggest to the jury that Beeks had a criminal background and that he had lied about it to get a job.

We conclude that the district court abused its discretion in failing to grant Beeks a new trial.

## II.

Beeks raised two alternative grounds for a new trial. He alleges that the improper questioning, along with the belated production of the Terrell letters, constitute a due process violation. He also challenges the sufficiency of the evidence. Having determined that Beeks is entitled to a new trial as a result of prosecutorial misconduct, we need not address these issues. The conviction and sentence are reversed and the case is remanded for a new trial.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.