# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3873

_____

United States of America,　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　Appellee,　　　　　　*
　　　　　　　　　　　　　　　　*　Appeal from the United States
　　　v.　　　　　　　　　　*　District Court for the
　　　　　　　　　　　　　　　　*　District of South Dakota.
Dominic Barrera,　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　Appellant.　　　　　*

_____

Submitted: November 19, 2010
Filed: January 10, 2011

_____

Before RILEY, Chief Judge, MELLOY and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Dominic Barrera appeals his conviction for two counts of assault, arguing that two instances of alleged prosecutorial misconduct entitle him to a new trial. We affirm.

## I.　BACKGROUND

In the early morning of December 6, 2007, Ernest Apodaca, Warren Hunter LaPointe ("Mr. LaPointe"), and Tracy LaPointe ("Ms. LaPointe")—Apodaca's girlfriend and Barrera's former girlfriend—drove to Rosebud, South Dakota, located

on the Rosebud Indian Reservation, after an evening of drinking alcohol and smoking marijuana. Apodaca, Mr. LaPointe, and Ms. LaPointe were parked outside the home of Ms. LaPointe's uncle when Barrera and George Casey Schmidt, who also had spent the evening consuming alcohol and smoking marijuana, pulled up beside them. A fight broke out between the two groups. Although stories differ as to which group started the fight, Barrera admitted at trial that he threw the first punch, that he punched and kneed Apodaca several times, and that he ended the fight by kicking Apodaca "as hard as [he] could." In describing the force of this final kick to the FBI agent who initially interviewed him, Barrera reported that he kicked Apodaca "as if he was kicking a 45-yard field goal." When the fight ended, Apodaca had been seriously injured. The bone structure of his face was badly damaged by blunt force trauma. Mr. LaPointe also suffered injuries.

A federal grand jury returned an indictment charging both Barrera and Schmidt with four counts of assault. Counts I and II charged them with assault with a dangerous weapon, shod feet, of Apodaca and Mr. LaPointe, respectively, violations of 18 U.S.C. §§ 1153, 113(a)(3). Counts III and IV charged them with assault of Apodaca and Mr. LaPointe, respectively, resulting in serious bodily injury, violations of 18 U.S.C. §§ 1153, 113(a)(6). Schmidt accepted a plea bargain and agreed to testify against Barrera. Barrera pled not guilty and went to trial. The jury found Barrera guilty of Counts I and III, the two counts involving Apodaca. The district court[1] sentenced Barrera to 48 months' imprisonment on each count, to run concurrently. On appeal, Barrera seeks a new trial, claiming that there were two instances of prosecutorial misconduct that deprived him of a fair trial.

Barrera first argues that the prosecutor acted improperly by eliciting testimony that he contends referred to allegations of domestic violence committed by him

---

[1] The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

against Ms. LaPointe. Before trial, the district court granted Barrera's motion in limine to preclude the Government from introducing any evidence regarding allegations that he had abused Ms. LaPointe during their relationship. In response to questioning by Barrera during cross-examination, Ms. LaPointe admitted that in the witness statement she wrote on the night of the fight she falsely claimed that Barrera and Schmidt started the fight by dragging her, Mr. LaPointe, and Apodaca out of their vehicle. Before redirect, in an effort to allow Ms. LaPointe to explain her motive for making this false accusation, the Government requested the court's permission to question Ms. LaPointe about Barrera's alleged abuse during their prior relationship. The court ruled that such testimony would be irrelevant but gave the prosecutor permission to ask Ms. LaPointe "a leading question" such as "if [she made the false accusation] because she was angry about what he did to her boyfriend [Apodaca] that night." The prosecutor, however, asked Ms. LaPointe generally why she had written the false accusation, rather than the specific leading question that the court had approved. Ms. LaPointe responded: "I was intoxicated and just tired of him doing everything he did to me, just wanted it to end." Barrera moved for a mistrial, arguing that this was an impermissible reference to the alleged domestic abuse. The court denied the motion.

The second alleged instance of misconduct occurred during the rebuttal portion of the Government's closing argument. The prosecutor argued, "You saw how Dominic Barrera looked. He sits here before you now in his suit. Look at the pictures, though, in terms of how he looked on December 6th, and imagine it's midnight on the streets of Rosebud when he is coming at you. . . . The animation, the punching, the shoes, the kicking, the dropping back and ultimately kicking the 45-yard field goal." Barrera immediately objected, and the court overruled his objection. He now argues that this appeal to the jurors to imagine Barrera coming at them constituted an impermissible "golden rule" argument. *See generally United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (holding that "[t]he prosecutor's comments," which "were akin to a golden rule violation because they suggested the

jurors were themselves direct victims of [the defendant's] crimes" were improper because they "encourage[d] the jury to 'depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence'" (quoting *Lovett ex rel. Lovett v. Union Pac. R.R. Co.*, 201 F.3d 1074, 1083 (8th Cir. 2000))).

## II.    DISCUSSION

We review the district court's denial of Barrera's motion for a new trial for abuse of discretion. *See United States v. Swift*, 623 F.3d 618, 623 (8th Cir. 2010). On appeal, "[w]e will reverse for prosecutorial misconduct only if the conduct, even if improper, so prejudiced [the defendant] that he was unable to obtain a fair trial." *Carlson v. Minnesota*, 945 F.2d 1026, 1029 (8th Cir. 1991). The district court also has "broad discretion in controlling closing arguments, and this court will not reverse absent an abuse of discretion." *United States v. Beckman*, 222 F.3d 512, 526 (8th Cir. 2000).

Although our general approach in examining allegations of prosecutorial misconduct is "to determine first whether the remarks were in fact improper, and second whether the remarks were so offensive so as to deprive the defendant of a fair trial," *United States v. Eldridge*, 984 F.2d 943, 946 (8th Cir. 1993), if we can determine that the challenged prosecutorial conduct, even if improper, was not prejudicial, nothing prevents us from affirming the conviction on this basis without deciding whether the challenged actions constitute misconduct. *See Swift*, 623 F.3d at 623 (assuming for the sake of argument that the challenged conduct was improper because "[e]ven if the prosecutor's comments . . . [were] improper, the comments were not prejudicial"). To determine whether an alleged error is prejudicial, "we consider the cumulative effect of the improprieties, the strength of the evidence against the defendant, and whether the district court took any curative action." *Id.* (quoting *United States v. Milk*, 447 F.3d 593, 602 (8th Cir. 2006)).

First, we consider the cumulative effect of the two instances of alleged prosecutorial misconduct. Barrera argues that the cumulative impact was significant because the reference to his alleged acts of domestic violence cast him "in the role of [a] woman beater" and the challenged remark in the closing argument "was designed to capitalize on that image and to maximize its prejudicial damage by urging the jurors to imagine themselves being physically attacked by the defendant on trial." We recognize that the cumulative effect of two or more missteps may require reversal "where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." *United States v. Samples*, 456 F.3d 875, 887 (8th Cir. 2006) (quoting *United States v. Riddle*, 193 F.3d 995, 998 (8th Cir. 1999)). In this case, however, we believe that Barrera has overstated the cumulative effect of the alleged improprieties. We find unpersuasive Barrera's contention that the jury necessarily understood Ms. LaPointe's opaque statement that she was "tired of [Barrera] doing everything he did to me" as a reference to alleged domestic abuse. The jury could just as easily have understood this as a reference to Barrera's attack on Ms. LaPointe's boyfriend, Apodaca, earlier that night. And even if some jurors understood the comment to refer to something that happened during Barrera and Ms. LaPointe's past relationship, there was no reason for them to suspect that Barrera had physically abused Ms. LaPointe.

Barrera argues that the prejudice of Ms. LaPointe's comment is clear because, following the Government's redirect, a juror submitted a question inquiring: "Why did [Ms. LaPointe] think there would be violence after five years of being broken up? Had he threatened her before?" This question, according to Barrera, constitutes "clear evidence that at least one juror got the prosecutor's message—loud and clear." However, we agree with the Government that this question was more likely prompted by Ms. LaPointe's testimony a few minutes earlier, after the district court asked her "when it was that [she] first realized that there was going to be physical violence," that

she expected physical violence "[a]s soon as [Barrera] pulled up," rather than by her vague reference to "everything [Barrera] did to me."

Because we find it unlikely that the jury understood Ms. LaPointe's testimony to refer to allegations of past domestic violence, Barrera's argument that the prosecutor's question "set the stage for further misconduct" in the closing argument that resulted in "a compounded cumulative prejudicial effect" fails to persuade. Of course, even if the two challenged actions did not combine to produce such a cumulative effect, it remains the case that "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated." *United States v. Beeks*, 224 F.3d 741, 746 (8th Cir. 2000) (quoting *United States v. Johnson*, 968 F.2d 768, 771 (8th Cir. 1992)). Accordingly, in order to weigh the effect of the alleged improprieties, we proceed to an examination of the strength of the Government's evidence against Barrera.

"If the evidence of guilt is overwhelming, an improper argument is less likely to affect the jury verdict." *Johnson*, 968 F.2d at 772 (quoting *United States v. Splain*, 545 F.2d 1131, 1135 (8th Cir. 1976)). The evidence against Barrera was strong. Apodaca, Ms. LaPointe, Mr. LaPoint, and Schmidt all testified for the Government at trial, although their testimony was inconsistent on some of the details of the fight, such as whether Apodaca threatened Barrera before the fight began. However, Barrera admitted that he threw the first punch and that he ended the fight by kicking Apodaca as hard as he could. Barrera also conceded that Apodaca had "serious bodily injury" within the meaning of 18 U.S.C. § 113(a)(6). Barrera's defense essentially rested on two theories. First, he advanced a self-defense theory, claiming that Apodaca had begun the fight by threatening him. Second, Barrera denied that he had caused Apodaca's most serious injuries, arguing instead that Schmidt may have kicked Apodaca as Barrera was fleeing the scene and that this may have caused most of Apodaca's injuries.

Both of Barrera's defenses were implausible. First, even taking Barrera's version of events as true, his self-defense theory fails. Although Barrera testified that Apodaca had started the fight by threatening him and that he thought Apodaca might have had a gun, he also testified that he threw the first punch, that he hit Apodaca multiple times and kneed him "towards his head" about four times, and that Apodaca was bleeding and "crouched down and had his hands in his face" when Barrera kicked him with his right foot as hard as he could. By that point in the fight, Apodaca already had been subdued, and "[f]orce used after the danger has ceased to exist cannot be justified on the basis of reasonable belief [that such force is necessary]." *United States v. Bordeaux*, 570 F.3d 1041, 1048 (8th Cir. 2009) (quoting *United States v. Thomas*, 946 F.2d 73, 77 (8th Cir. 1991)); *see also United States v. Wagner*, 834 F.2d 1474, 1486 (9th Cir. 1987) ("[The defendant's] role as the aggressor . . . deprives him of the right to assert [self] defense."); *United States v. Garcia*, 625 F.2d 162, 170 (7th Cir. 1980) (holding that "[t]he cause of the original fight" was "largely irrelevant" because the defendants' self-defense justification "ceased when they became the aggressors"). Thus, even assuming that Apodaca's threats alone could justify Barrera's actions at the beginning of the fight, he clearly had no self-defense justification for kicking an incapacitated Apodaca "as if he was kicking a 45-yard field goal."

Second, Barrera's contention that Schmidt may have caused the most serious of Apodaca's injuries was contradicted by overwhelming evidence. Apodaca testified that although both Barrera and Schmidt beat him, Barrera's attack was more serious than Schmidt's. Schmidt testified that he did not kick Apodaca. And Barrera himself admitted that he punched and kneed Apodaca multiple times and that he kicked him as hard as he could at the end of the fight. The combined strength of this testimony makes Barrera's contention that he did not cause Apodaca's serious bodily injury implausible.

In short, Barrera admits that he beat Apodaca in what can only be described as a brutal manner and that Apodaca suffered serious bodily injury. Even according to Barrera's own version of events, at a minimum, the final kick when Apodaca was effectively incapacitated was not justified by self-defense. Moreover, Barrera's contention that Schmidt may have caused Apodaca's most serious injuries was implausible, in light of the other evidence introduced at trial. Accordingly, we find the evidence against Barrera to be overwhelming, and we conclude that even if either or both instances of alleged misconduct were actually improper, such misconduct was unlikely to have affected the verdict. *See Splain*, 545 F.2d at 1135-36 ("The overwhelming evidence of guilt in this case convinces us that the prosecutor's comment could not have prejudiced [the defendant] or affected the jury verdict.").

Finally, we examine "the curative actions taken by the trial court." *United States v. Hernandez*, 779 F.2d 456, 460 (8th Cir. 1985). With regard to the first instance of alleged misconduct, the district court offered to give a cautionary instruction moments after the challenged testimony occurred, but Barrera declined, due to his fear that such an instruction "would highlight that part of the testimony and would actually compound the prejudice." Jurors are presumed to follow the court's instructions, *United States v. Smith*, 508 F.3d 861, 866 (8th Cir. 2007), and the instruction offered by the district court accordingly could have alleviated any possible prejudice. Since Barrera refused the instruction, he "can not now complain that the evidence may have prejudiced the jury. . . . The trial judge can not be faulted for any trial mishaps that he offers to and could correct." *Splain*, 545 F.2d at 1133.

Regarding the challenged remark during closing argument, no curative instructions were offered or given because the court overruled Barrera's objection to the argument. However, when the district court submitted the case to the jury, it instructed the jurors that "[s]tatements, arguments, questions and comments by lawyers representing the parties in the case are not evidence." To be sure, "[i]deally, the trial court should give a cautionary instruction to the jury immediately after the

misconduct occurs," *Hernandez*, 779 F.2d at 461, but we believe that the general instruction against considering counsel's arguments as evidence still had some curative effect, *see id.* Accordingly, especially in view of the overall strength of the evidence against Barrera, "the lack of a specific and immediate cautionary instruction is not serious enough to tip the balance toward reversal." *Id.*

## III. CONCLUSION

Even assuming that the prosecutor's challenged conduct was improper, considering the strength of the evidence, the cumulative effect of the two alleged improprieties was not so prejudicial that Barrera "was unable to obtain a fair trial." *Carlson*, 945 F.2d at 1029. Accordingly, we affirm Barrera's conviction.

_____