# United States Court of Appeals
### For the Eighth Circuit

_____

No. 23-1649

_____

Ronald Lee Neels

*Petitioner - Appellee*

v.

Brent Fluke, Warden, Mike Durfee State Prison

*Respondent - Appellant*

_____

Appeal from United States District Court
for the District of South Dakota - Southern

_____

Submitted: February 14, 2024
Filed: July 25, 2024

_____

Before SMITH, Chief Judge,[1] BENTON, and STRAS, Circuit Judges.

_____

SMITH, Chief Judge.

The State of South Dakota (State) charged Ronald Lee Neels with rape, sexual contact, and incest for the sexual abuse of his adopted daughter over a 14-year period.

---

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

At Neels's jury trial, the prosecutor began her opening statement by asking the jurors to "[i]magine a world where you're a little girl without a dad," R. Doc. 37, at 2, and thus to place themselves in the victim's position, *see Lovett ex rel. Lovett v. Union Pac. R.R. Co.*, 201 F.3d 1074, 1083 (8th Cir. 2000) ("A Golden Rule argument asks the jury to place itself in the defendant's position. Such an argument is universally condemned because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." (internal quotation marks and citation omitted)). The prosecutor then listed examples of sexual abuse that Neels's adopted daughter later testified to at trial. Neels lodged no objection.

Following his conviction and incarceration, Neels filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254, alleging, in part, that his attorneys were ineffective for not objecting to the prosecutor's opening statement. The district court granted Neels's petition, concluding that Neels suffered prejudice from his attorneys' failure to object. We reverse.

I. *Background*

A. *Proceedings Before the State Trial Court*

Neels was charged with, and proceeded to a jury trial on, 14 counts of sex-related offenses concerning the sexual abuse of his adopted daughter, T.N. At trial, the prosecutor began her opening statement as follows:

> May it please the Court, counsel, Members of the Jury. *Imagine a world where you're a little girl without a dad*. It's just you and your mom and you're on your own. But you're little and so you don't really know any different.
>
> Then there comes a day when your mom meets someone so very special that they decide to get married. And for the first time in your life you have a real live dad, something that so many kids take for granted, a dad. Not only that, but he adopts you at the age of three to make it

-2-

official. You are all his. He treats you like his right-hand girl. You get to help him around the farm. Could life really be any better?

And then something changes. You change. Your body is changing in ways you don't understand and are really hard to talk about. And while all of this is going on, your dad is dealing with issues of his own. He's going to have back surgery. He's having surgery but you're there to help.

Then something else changes. Your dad changes. He loves you and he's asking you to wash him in the shower. Because of the back surgery he really can't reach certain spots on his body so he just needs you to help. It's awkward. And at first he covers the private areas and so, you know, you do it.

But then one day you go to wash him and he's no longer covered. He asks you to wash him. It's weird. It's awkward. But you do it because he's your dad and you're supposed to be helping. And so you do it. Not only that, but as you wash him you realize that things about his body are different. His penis is sticking out. It's hard. It's weird. Time passes. Pretty soon you're supposed to get into the shower with him because it's just easier to wash him. And eventually you have to do more than just wash him.

Then it goes beyond the shower and he starts putting his fingers in your vagina. And when you've grown pubic hair he decides to teach you how to groom it and then he licks it. He licks your vagina. It tickles a little bit.

Then as you get older he starts to treat you more like a girlfriend than a daughter. It's nice to have someone so close, someone you can trust to help you figure out your own body and, after all, he's just preparing you for boys so that you know what to expect and know what to do—or at least that's what dad says.

Time passes. You're a teenager. Dad is your full time boyfriend and you are in love and he seems to love you back—to the moon and

back, in fact. That's at least what he says. He calls you his satin butterfly; as beautiful as a butterfly in the rays of the sun.

Then you start to figure out there is something about this relationship with dad that isn't quite right. You realize what you thought was the best and closest relationship that you had was really a nightmare.

This is how [T.N.], at the ripe old age of 23 years old, has lived her life.

R. Doc. 37, at 2–3 (emphasis added). Neels's counsel lodged no objection to these statements.

The State called T.N. as its first witness. She testified that Neels entered her life when she was two years old. He married her mom and adopted her. T.N. lived with her mother and Neels on a rural farm. T.N. recalled her relationship with Neels as normal when she was small. But that relationship began to change when T.N. got older. When she was 9 years old, Neels began telling T.N. that she was beautiful and started hugging and kissing her. T.N. recounted that when she was 9 or 10 years old, Neels asked her to help him in the shower after his back surgery. Specifically, he requested that she wash his private parts.

When T.N. was in the fifth grade, Neels, while nude, put T.N. on the couch, removed her underwear and shorts, and trimmed her pubic hair. After trimming T.N.'s pubic hair, Neels performed oral sex on her. T.N. testified that she was 10 or 11 years old at the time.

The sexual abuse continued in the coming years. When T.N. was 12 years old, Neels entered T.N.'s bedroom, touched her bare breasts, and placed two fingers inside her vagina. Neels instructed T.N. not to tell anyone about what happened or she would get in trouble. When T.N. was 12 or 13 years old, Neels put his penis inside her vagina while they were on the hood of a lawnmower in the garage. Thereafter,

Neels increased his sexual activity in the shower. He eventually told T.N. to get in the shower naked with him. They would wash each other, and he would touch her all over. Neels also made T.N. give him oral sex in the shower multiple times. On other occasions, Neels made T.N. give him oral sex in the goat barn, and he had vaginal intercourse with T.N. in the horse barn. T.N. testified that sexual events happened repeatedly in the outbuildings on the farm where she lived with Neels.

T.N. also recalled sexual abuse between the ages of 16 and 18. When T.N. was approximately 16 years old, Neels touched her and had intercourse with her in his semi-truck at a truck stop on 12th Street in Sioux Falls. When T.N. was between the ages of 16 and 18, Neels had intercourse with her on the dining room table of their home, causing the table to break. Also during this time, Neels had intercourse with T.N. on the bathroom sink in their home and broke the corner off the vanity while doing so. After Neels had a second back surgery, he again made T.N. wash him and made her give him oral sex in the shower. T.N. believed her relationship with Neels was normal until age 17. Neels had told her that all fathers did these sexual acts with their daughters and that this was how fathers show their daughters that they love them.

T.N. testified that she continued having sexual intercourse with Neels between the ages of 18 and 22. These incidents happened mostly in Neels's semi-truck and occurred numerous times at the same truck stop in Sioux Falls on 12th Street. T.N. stated that despite her desire for the molestation to stop, Neels refused, got mad and would yell at her. T.N. recounted several instances of physical violence during this time period. First, Neels tried suffocating T.N. with a pillow. "When Neels finally lifted the pillow from T.N.'s face he asked, 'how did that feel?'" R. Doc. 33, at 6. Second, Neels aggressively approached T.N., cornered her on the screened-in porch, and then punched a hole through the screen right next to T.N.'s head. Third, Neels once violently squeezed T.N.'s head and asked if her boyfriend would come save her in time. Fourth, on one occasion, Neels began banging on the house's exterior wall

that connected to T.N.'s bedroom, where T.N. was sleeping in bed with a male. Neels then entered the house, called her a slut and a whore, and told her he did not love her any more and that he was no longer her dad.

T.N.'s mother, Monica, also testified for the State. Monica recalled that when T.N. turned 9 years old, she became distant and quiet. She stated that T.N. was 9 years old when Neels had his first back surgery. Neels told Monica that T.N. had helped him with showering, but that he made sure she did not see his genitals. According to Monica, prior to Neels's first back surgery, they had a normal sexual relationship; however, after the surgery, it became "pretty nonexist[e]nt." *Id.* at 7 (internal quotation marks omitted).

Monica has two daughters besides T.N.—one older and one younger. The younger is Neels's biological daughter. Monica testified that Neels's relationship with their other two daughters was normal. Monica stated that while Neels regularly took T.N. with him on trucking trips, he did not take his other daughters. Monica explained that Neels was much stricter with T.N. than with their other daughters. He disliked T.N. spending time with friends (male or female); wanted to know where she went and what she did; and took issue with what she wore. Monica testified that Neels was especially strict regarding T.N.'s dating. For example, Neels would "go onto Google Earth and scope out the landscape and warn T.N. that the boy could rape her or have his way with her at various locations on the map." *Id.* (internal quotation marks omitted).

Monica recalled damage to their home and furniture during the relevant time period. She remembered their dining room table suddenly collapsing when she overturned a soap mold on it. She also noticed that the corner of the vanity in their bathroom had broken off; Neels told Monica that the damage resulted from him hitting the corner with the shower head. Monica testified that a five-inch hole

appeared in a door on the first floor of their home right at eye level soon after T.N. visited.

Monica explained that when T.N. became an adult, she was always angry, very upset, and really hurt. Monica testified that during the last five years, Neels and T.N.'s relationship was "explosive." *Id.* at 8 (internal quotation marks omitted). According to Monica, Neels continued wanting to know where T.N. was and what she was doing even after she became an adult and no longer lived at home. When T.N. decided to move in with a male, Neels objected. He advised her that she should not give away her virginity "to a man she did not know, that she would be living in sin[,] and that God would hold it against her." *Id.* at 7–8. Neels never made similar statements to the other daughters. On one occasion, Monica awoke in the middle of the night and heard Neels and T.N. arguing. She "attempted to intervene and . . . Neels called her a b---h and told her it was not any of her concern." *Id.* at 8. During another argument, "Monica witnessed . . . Neels holding T.N.'s head on either side with his hands and squeezing, telling her that if he wanted to, he could squeeze her head until her brains popped out." *Id.* He then mocked T.N., asking why she would not call her boyfriend over. Neels threatened to make T.N. watch him kill the boyfriend before killing her.

Sergeant Mike Walsh of the Minnehaha County Sheriff's Office testified for the State. At age 22, T.N. disclosed that Neels had sexually abused her as a child. During his investigation, Sergeant Walsh interviewed Neels for approximately three hours. The State played a redacted version of a video recording of the interview for the jury. At one point, while Neels spoke, he interrupted himself and inquired, "[Y]ou can't use what I say against me, right? You can't use what I say to charge me with a crime?" *Id.* at 9 (internal quotation marks omitted). In response, Sergeant Walsh reminded Neels that he had been advised of the *Miranda*[2] rights at the start of the

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

interview and that Neels controlled what he chose to say. After these reminders, Neels responded that "he would leave that part out then." *Id.* (internal quotation marks omitted).

As he spoke with Sergeant Walsh, Neels characterized T.N. as a chronic liar who was angry with Neels. He asserted that her anger stemmed from his discipline for her conduct, which included "boozing and boys." *Id.* at 10 (internal quotation marks omitted). For the first hour and 31 minutes of the interview, Neels denied any inappropriate sexual activity between him and T.N. Thereafter, he confessed to certain events but insisted that T.N. was an adult or at least age 16 when those events occurred. Neels first admitted that "it" began to happen after Neels had his second back surgery when T.N. was 16 years old. *Id.* (internal quotation marks omitted). Neels stated that T.N. wanted to wash his genitals in the shower, he allowed her to do so*,* and he reciprocated by washing her. By Neels's estimate, three or four sexual encounters occurred between him and T.N. during the nine months following his surgery. According to Neels, he first had sexual intercourse with T.N. in his semi-truck when she was 18 years old; the first time he gave T.N. oral sex was when T.N. was in high school; and the first time T.N. gave him oral sex was when she was in high school and older than 16. Neels stated that after T.N. turned 16 but before she was 18, they probably engaged in oral sex or touching of the genitals three or four times. He also admitted that, on a couple of occasions, T.N. crawled into bed with him and lay on top of him.

Later in the interview, Neels admitted to sexual conduct with T.N. when she was 14 years old. Neels recalled first touching T.N.'s genitals with his fingers when she reached puberty at age 14 or 15; however, he later admitted that T.N. had actually experienced puberty at age 12. Neels recalled explaining to T.N. that she needed to groom her pubic area and showing her how to do so. Neels later admitted that it was on this same occasion that he first performed oral sex on T.N. Neels confessed that,

prior to T.N. turning 16, they probably engaged in oral sex or touching of the genitals three or four times.

In addition, Neels described a time when T.N. was with him in his semi-truck and exposed her breasts to him and rubbed them on either side of his head while he was driving. And although he acknowledged once owning a riding lawnmower, he denied T.N.'s account of having sex on it. Neels acknowledged that a possible encounter had occurred on a hay bale in an outbuilding.

Neels adamantly denied forcing or threatening T.N. to have sex. He told Sergeant Walsh that he felt love for T.N., not lust or perversion. His pet name for T.N. was "satin butterfly." *Id.* at 12 (internal quotation marks omitted). He admitted to telling T.N. that he would like her to give birth to his son. According to Neels, T.N. told him that she wanted to marry him. And Neels told Sergeant Walsh that if he had met T.N. at a different time under different circumstances, he and T.N. would have been married "in a heartbeat." *Id.* at 10 (internal quotation marks omitted).

Sergeant Walsh further testified that Neels was born in 1962 and was thus age 53 at the time of trial. Sergeant Walsh pointed out that Neels made clear during the interview that he defined "virginity" as T.N. not having sex with anyone but him.

The only witness whom Neels called in his defense was his sister Rhonda. She testified to speaking with T.N. shortly after T.N. initially disclosed the abuse. According to Rhonda, T.N. told her that the molestation began when T.N. was 14 years old.

During closing arguments, the prosecutor again invited the jurors to put themselves in T.N.'s position. This time, Neels's defense attorney objected, stating, "I think it's improper to ask the jury to put themselves in the position of the victim."

*Id.* at 2–3 (internal quotation marks omitted). The prosecutor then changed her approach.[3]

The jury found Neels guilty on all 14 counts. The trial court sentenced Neels to 75 years' imprisonment.

### B. *Direct Appeal*

Neels directly appealed his conviction and sentence. Relevant to the present case, he argued that "the prosecutor's arguments during . . . opening statement were improper and denied [him] a fair trial." R. Doc. 23-3, at 5 (all caps omitted). Neels conceded that the South Dakota Supreme Court's review was for plain error because he failed to raise the issue with the trial court.

The South Dakota Supreme Court summarily affirmed his conviction in a one-page opinion, which stated:

> The Court considered all of the briefs filed in the above-entitled matter, and in light of the record in this case, Neels has not met his burden that the state's improper opening statement so infected his trial that his conviction violates due process. The Court concludes pursuant to SDCL 15-26A-87.1(A), that it is manifest on the face of the briefs and the record that the appeal is without merit on the following grounds: 1. that the issues on appeal are clearly controlled by settled South Dakota law or federal law binding upon the states, 2. that the issues on appeal are factual and there clearly is sufficient evidence to support the verdict, and 3. that the issues on appeal are ones of judicial discretion and there clearly was not an abuse of discretion . . . .

R. Doc. 23-6, at 1.

_____

[3]The record is unclear as to the court's disposition of the objection; however, the magistrate judge "inferred that the [trial] court sustained the objection in closing arguments because the prosecutor immediately changed her argument." *Id.* at 3.

## C. *State Habeas Proceedings*
### 1. *Circuit Court*

Neels filed a state petition for a writ of habeas corpus in which he argued, among other things, that "[t]rial counsel were ineffective because they failed to object to the prosecutor's . . . opening statement. Appellate counsel was presented with a more onerous standard of review on appeal because trial counsel failed to object." R. Doc. 33, at 16.

The state habeas court granted summary judgment to the State on Neels's claims. "[T]he court stated it was *not* denying . . . Neels'[s] petition on the merits. Rather, the court held that *res judicata* barred consideration of . . . Neels'[s] habeas claims." *Id.* (citation omitted). The court explained that the direct appeal resolved the prejudice issue "because the showing of prejudice . . . Neels would have had to have made under plain error review on direct appeal is the same showing of prejudice . . . Neels would have to make to show prejudice as a result of counsel's alleged ineffectiveness." *Id.* As a result, "if the appellate court found no prejudice under plain[-]error review during . . . Neels'[s] direct appeal, the issue of prejudice for ineffective assistance of counsel was already litigated and decided adversely to . . . Neels." *Id.* at 16–17. The court declined to permit Neels to relitigate this issue in his habeas petition.

Neels then sought a certificate of probable cause from the state habeas court on three issues. The court granted the certificate on the following issues: "(1) whether a finding of no plain error in this case precludes a subsequent assertion of prejudice as a result of trial counsel's alleged ineffectiveness and (2) whether there were genuine issues of material fact preventing the entry of summary judgment in . . . Neels'[s] habeas case." *Id.* at 17.

## 2. *South Dakota Supreme Court*

The South Dakota Supreme Court affirmed. *Neels v. Dooley*, 969 N.W.2d 729, 731 (S.D. 2022). It held that the proper review standard for Neels's case was plain error using the same prejudice analysis attendant to ineffective assistance of counsel cases under *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, "failure to prove prejudice on plain error review precludes a petitioner from demonstrating prejudice for purposes of *Strickland* on habeas for the same underlying trial errors." *Neels*, 969 N.W.2d at 734. It determined that the habeas court "correctly concluded that a finding on direct appeal that a defendant did not show prejudice under plain error review would preclude a finding of prejudice by a habeas court reviewing the same trial record with respect to the same alleged error." *Id.* at 736.

The court also held that "a finding of prejudice on habeas review would be inconsistent with th[e] [South Dakota Supreme] Court's ruling on direct appeal" that Neels failed to satisfy "his burden that the state's improper opening statement *so infected his trial that his conviction violates due process*." *Id.* at 737 (internal quotation marks omitted). The court explained that its conclusion "that the improper statement did not violate Neels's right to due process" meant that Neels could not "establish on habeas that his trial counsel's performance resulted in an unreliable outcome." *Id.* (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) ("Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.")). Thus, "the habeas court properly determined that res judicata preclude[d] relief" on Neels's ineffective-assistance claim. *Id.*

## D. *Section 2254 Petition*

Neels subsequently filed a § 2254 petition, arguing, among other things, that "his Sixth and Fourteenth Amendment rights were violated when his trial counsel failed to object to the prosecutor's improper remarks during opening statements." R.

Doc. 33, at 19. The State[4] moved for judgment on the pleadings, arguing, among other things, that Neels's ineffective-assistance claim was procedurally defaulted because it was barred by South Dakota's res judicata doctrine.

### 1. *Magistrate Judge*

The magistrate judge issued a report and recommendation (R&R) to the district court on Neels's § 2254 petition. In the R&R, the magistrate judge rejected the State's procedural-default argument on Neels's ineffective-assistance claim but ultimately recommended denying the claim on the merits for failure to prove prejudice. The magistrate judge credited T.N.'s testimony and found that Monica's testimony, as well as Neels's own interview statements, corroborated T.N.'s account. Even Neels's sole defense witness, the magistrate judge noted, "basically confirmed that T.N. said the abuse had occurred, but asserted that T.N. originally stated the abuse began when she was age 14 instead of age 9 or 10." *Id.* at 44–45. The magistrate judge concluded that trial counsel's failure "to object to the '[G]olden [R]ule' argument in opening statements is but a grain of sand when compared to the vast beach of evidence of guilt offered at . . . Neels'[s] trial." *Id.* at 45. Ultimately, the magistrate judge considered the government's evidence overwhelming.

### 2. *District Court*

The district court rejected the magistrate judge's recommendation to dismiss the habeas petition with prejudice. First, the district court concluded that counsel's failure to object to the Golden Rule argument was not part of a litigation strategy, as his counsel admitted. The district court noted that the state trial court had sustained a similar objection during closing argument, "suggesting that such an objection during the opening statement would have been successful." R. Doc. 37, at 21. According to the court, "Because the failure to object was not part of a trial strategy

---

[4]The respondent is Brent Fluke, Warden, Mike Durfee State Prison.

and because the prosecutor's arguments are 'universally condemned[,]' . . . counsel's failure to object was deficient." *Id.* (alteration in original).

Second, the district court rejected the magistrate judge's conclusion that Neels was not prejudiced under *Strickland* by his attorneys' failure to object to the prosecutor's opening statement. The district court acknowledged that "[t]he strength of the evidence in this case . . . is overwhelming." *Id.* at 22. But it nonetheless concluded that "the magnitude of the error in question is also overwhelming" because "[t]he prosecutor provided a detailed and vivid narrative in which the jury was asked to imagine themselves going through a years-long traumatic experience" and the Golden Rule violation "occurred at the very start of trial, last[ing] several minutes." *Id.* The court further noted that the failure to object resulted in the trial court taking no action to cure the misconduct. And, although the trial court gave preliminary and final jury instructions that statements of counsel are not evidence, the district court concluded that "the sufficiency of similar preliminary jury instructions has been discredited by the Eighth Circuit." *Id.* at 24 (citing *United States v. Conrad*, 320 F.3d 851, 856 (8th Cir. 2003)). In summary, the district court determined that

> [t]he magnitude of the prosecutorial misconduct in the opening statement of Neels'[s] trial requires that his conviction be vacated. To do otherwise would allow the State to violate all the prosecutorial misconduct rules without consequence if the defendant faces sufficiently strong evidence. In essence, if the evidence is sufficiently strong, defendants would have no right to a fair trial.

*Id.* at 27. The district court denied the State's motion for judgment on the pleadings and granted the § 2254 petition.

II. *Discussion*

The State appeals, arguing that the district court erred in determining that Neels suffered *Strickland* prejudice from his counsel's failure to object to the prosecutor's opening statement because there is overwhelming evidence of Neels's guilt.

"A district court's decision in a habeas claim of ineffective assistance of counsel presents a mixed question of fact and law. We review the ineffective assistance issue de novo, but findings of underlying predicate facts are reviewed under the clearly erroneous standard." *McLaughlin v. Precythe*, 9 F.4th 819, 827 (8th Cir. 2021) (internal quotation marks and citation omitted).

The Sixth Amendment guarantees a criminal defendant "the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "It has long been recognized that the [Sixth Amendment] right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). A defendant alleging ineffective assistance of counsel must prove (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. Here, the State "is not challenging the district court's determination that Neels's attorneys provided deficient performance by not objecting to the prosecutor's opening statement." Appellant's Br. at 8 n.3.[5] Thus, the only question before us is whether Neels was prejudiced by counsel's deficient performance.

Under *Strickland*, a criminal defendant proves prejudice by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. "In certain Sixth Amendment contexts, prejudice is presumed." *Id.* at 692. "Due to the fact that prejudice may be

[5]The State also does not challenge the district court's conclusion that the ineffective-assistance claim is not procedurally barred.

presumed only when surrounding circumstances justify a presumption of ineffectiveness, courts have been appropriately cautious in presuming prejudice. For the most part, courts have presumed prejudice only where the defendant establishes a constructive denial of counsel." *McGurk v. Stenberg*, 163 F.3d 470, 473–74 (8th Cir. 1998) (cleaned up). The Supreme Court presumes prejudice in the following circumstances: (1) "if the accused is denied counsel at a critical stage of his trial," (2) if the accused is "left entirely without the assistance of counsel on appeal," (3) "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," and (4) "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken." *Garza v. Idaho*, 586 U.S. 232, 237 (2019) (internal quotation marks omitted).

Neels has never expressly argued presumed prejudice based on a *Garza* circumstance; however, he essentially asks us to presume prejudice by asserting that "[a]lthough the evidence introduced at trial might have been overwhelming, the magnitude of the Golden Rule violation was also overwhelming." Appellee's Br. at 5. Neels's allegation that his counsel was ineffective for failing to object to the prosecutor's opening statement does not "fall within [the aforementioned] categories" and is not "in any way analogous to such circumstances." *United States v. Hise*, 65 F.4th 905, 909 (7th Cir. 2023). We decline Neels's invitation to hold that the Golden Rule violation, on this record, was sufficiently egregious to warrant a presumption of prejudice.

Because no presumption of prejudice applies, Neels must "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. "Under *Strickland*, the issue is not whether the prosecutor's [opening argument] was improper, but whether [Neels] has shown a reasonable probability that, but for counsel's failure to object, the result would have been different." *Close v. United States*, 679 F.3d 714, 718 (8th Cir. 2012) (cleaned up). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In determining whether Neels's attorneys'

-16-

failure to object to the prosecutor's opening statement "resulted in the required prejudice," we must "presume . . . that the . . . jury acted according to law." *Id.* Because Neels is challenging his conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with *overwhelming record support*." *Id.* at 696 (emphasis added); *see Christenson v. Ault*, 598 F.3d 990, 997 (8th Cir. 2010) ("When there is overwhelming evidence of guilt presented, it may be impossible to demonstrate prejudice."); *Reed v. Norris*, 195 F.3d 1004, 1006 (8th Cir. 1999) ("[G]iven the overwhelming evidence of Reed's guilt presented at trial, we find that it would be impossible for him to demonstrate prejudice under *Strickland*.").

In light of the overwhelming evidence of Neels's guilt, we hold that his attorneys' failure to object to the prosecutor's opening statement did not prejudice Neels's defense. *See Close*, 679 F.3d at 718 ("Bearing in mind the strength of the government's other evidence, Close has failed to show a reasonable probability the jury would have rendered a different verdict had counsel timely objected to the improper rebuttal."). As described previously, T.N. testified with great detail about Neels's sexual abuse. She "recalled the place and season of the events, her own age, what clothing she was wearing at the time, what clothing was removed and by whom, as well as explanations, rationales, and pet names given by . . . Neels during the events." R. Doc. 33, at 43. Second, Monica's testimony corroborated significant details from T.N.'s testimony. Finally, Neels *confessed* to Sergeant Walsh much of his sexual abuse of T.N. and confirmed many of the details that T.N. had disclosed to law enforcement and testified to at trial. Neels admitted to having sexual intercourse with T.N. at multiple locations, performing oral sex on T.N. and having her perform oral sex on him, and touching T.N.'s genitals on multiple occasions.

The district court, though acknowledging the "overwhelming" "strength of the evidence in this case," concluded that "the magnitude of the error in question is also overwhelming" and therefore granted habeas relief. R. Doc. 37, at 22. In so holding, the district court relied on a line of cases "examining allegations of prosecutorial misconduct." *Id.* (quoting *United States v. Barrera*, 628 F.3d 1004, 1007 (8th Cir. 2011)); *see also United States v. Swift*, 623 F.3d 618, 623 (8th Cir. 2010); *United States v. Cannon*, 88 F.3d 1495, 1503 (8th Cir. 1996).

"This circuit has set forth a two-part test for reversible prosecutorial misconduct: 1) the prosecutor's remarks or conduct must have been improper; and 2) such remarks or conduct must have prejudicially affected defendant's substantial rights so as to deprive him of a fair trial." *United States v. Beckman*, 222 F.3d 512, 526 (8th Cir. 2000). "[I]f we can determine that the challenged prosecutorial conduct, even if improper, was not prejudicial," we may "affirm[] the conviction on this basis." *Barrera*, 628 F.3d at 1007. Under the prosecutorial-misconduct prejudice inquiry, we consider the following factors: "1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence of the defendant's guilt; and 3) any curative actions taken by the trial court." *Beckman*, 222 F.3d at 526 (citing *Cannon*, 88 F.3d at 1502). "The critical question . . . is whether the argument of which the defendant complains was so offensive as to deprive the defendant of a fair trial." *Id.*

Even assuming this three-part prejudice inquiry controls in an ineffective-assistance case concerning defense counsel's failure to object to a prosecutor's improper statements, Neels suffered no prejudice. First, as previously discussed, the evidence against Neels is overwhelming.

Second, although the trial court did not give a specific curative jury instruction in response to the prosecutor's opening statement (because Neels's counsel failed to object to the improper comments), the trial court *did* instruct the jury that "statements made by attorneys were not evidence and that statements made by attorneys that were

not supported by evidence should not be considered." R. Doc. 37, at 25. We have previously found such an instruction sufficiently curative.[6]

The district court's and Neels's reliance on *Conrad* is misplaced. In *Conrad*, the district court's curative actions "were insufficient to protect the defendant's right to a fair trial" because the prosecutorial misconduct was not an isolated event but instead occurred throughout trial. 320 F.3d at 857 ("[T]he improper remarks were communicated in both the opening statement and closing argument, as well as during testimony of [a witness] . . . ."). Here, by contrast, the unobjected-to misconduct occurred during the prosecutor's opening statement,[7] and overwhelming evidence of guilt exists. Furthermore, as the State points out, "[b]ecause Neels's claim centers solely on the ineffective assistance of his attorneys, the Supreme Court mandates that we presume the 'jury acted according to law.'" Appellant's Br. at 24 (quoting *Strickland*, 466 U.S. at 694).

Finally, the prosecutor's unobjected-to improper comments were limited to the opening statement; as the State points out, that opening statement "spanned just three

---

[6]*See Barrera*, 628 F.3d at 1010 ("Regarding the challenged remark during closing argument, no curative instructions were offered or given because the court overruled Barrera's objection to the argument. However, when the district court submitted the case to the jury, it instructed the jurors that '[s]tatements, arguments, questions and comments by lawyers representing the parties in the case are not evidence.' To be sure, '[i]deally, the trial court should give a cautionary instruction to the jury immediately after the misconduct occurs,' but we believe that the general instruction against considering counsel's arguments as evidence still had some curative effect. Accordingly, especially in view of the overall strength of the evidence against Barrera, 'the lack of a specific and immediate cautionary instruction is not serious enough to tip the balance toward reversal.'" (alterations in original) (first quoting internal record, and then quoting *United States v. Hernandez*, 779 F.2d 456, 461 (8th Cir. 1985))).

[7]Defense counsel objected to the prosecutor's remarks during closing argument.

pages of the six-volume jury trial transcript that totaled more than 700 pages." *Id.* at 27; *see United States v. Rodriguez*, 581 F.3d 775, 804 (8th Cir. 2009) ("The closing-argument errors found by this court had a small effect in this case, which was long and filled with overwhelming evidence of Rodriguez's guilt and the violence of Sjodin's abduction and murder.").

### III. *Conclusion*

Accordingly, we reverse the judgment of the district court.

_____