# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1240

_____

United States of America,           *
                                        *

           Appellant,        *
                                        *   Appeal from the United States

     v.                     *   District Court for the
                                        *   District of Nebraska.

Jerome Bass, also           *
known as Rommie,        *
                                        *

           Appellee.         *

_____

Submitted: November 13, 2006
Filed: February 28, 2007

_____

Before MURPHY, ARNOLD, and BENTON, Circuit Judges.

_____

ARNOLD, Circuit Judge.

After a jury convicted Jerome Bass of conspiring to distribute 50 grams or more of cocaine base, *see* 21 U.S.C. §§ 841(a)(1), (b)(1), 846, the district court granted Mr. Bass's motion for a new trial. The government appeals and we reverse.

The district court granted a new trial based primarily on the allegedly perjurious testimony of Mr. Bass's cousin, Karlos Harper, who testified against the defendant at trial. Mr. Harper had been charged with participating in a crack cocaine conspiracy and agreed to cooperate with the government. After a grand jury indicted Mr. Bass

based on other evidence, Mr. Harper provided further incriminating evidence against him.

When Mr. Harper testified at a pre-trial hearing in Mr. Bass's case, however, he first denied ever telling Police Officer Jeffrey Gassaway that Mr. Bass was involved in dealing crack cocaine. And though Officer Gassaway said that Mr. Bass had stated that he delivered clothes that possibly had crack cocaine hidden in them, Mr. Harper testified that Mr. Bass shuffled "[n]othing but clothes" between his own home and a house where Mr. Harper lived with Mr. Bass's brother, Lamar. But later in the same hearing, Mr. Harper recanted his earlier testimony and implicated Mr. Bass in the crack conspiracy. He stated that he had testified untruthfully earlier in the hearing because he was "under a lot of pressure" since Mr. Bass was his cousin and Mr. Bass's mother, Mary Bass, had helped raise Mr. Harper and was present in the courtroom. Mr. Harper then testified that when Lamar would leave the house that he shared with Mr. Harper he would give his crack cocaine to Mr. Bass to sell for him. On cross-examination, Mr. Harper stated that his initial testimony denying Mr. Bass's involvement in the conspiracy had not been coerced, and that after giving the earlier testimony he conferred with his lawyer and became afraid that his initial testimony would prevent him from getting a downward departure at sentencing.

At Mr. Bass's trial, Officer Gassaway testified that the defendant, after waiving his *Miranda* rights, stated to the officer that he had delivered clothing for his brother, Lamar, that may have had crack cocaine hidden in it. The government also presented the testimony of cooperating witnesses, who attested to Mr. Bass's involvement in the crack conspiracy. Mr. Harper's trial testimony was consistent with the second part of his testimony at the pre-trial hearing: He stated that several times in 2002, Lamar left about half an ounce of crack with Mr. Bass at the house that Lamar shared with Mr. Harper, and told Mr. Bass what to charge if someone came by to make a purchase. Mr. Harper also testified that on twenty or thirty occasions he referred Mr. Bass customers who had come to the house to purchase crack from Mr. Harper. Mr. Harper

reiterated that he had initially testified untruthfully in favor of Mr. Bass at the pre-trial hearing because he felt pressured by the presence of his Aunt Mary, who was "like a mother" to him, and Mr. Bass, whom he thought of as a brother. Mr. Harper also related that Mr. Bass had tried to convince him not to testify at trial.

On cross-examination, Mr. Harper testified that he had initially lied at the pre-trial hearing but had told the truth after meeting with his lawyer because he was afraid of not getting a downward departure. Mr. Harper also acknowledged having later signed a notarized statement in which he said that Officer Gassaway had threatened him, but at trial he said that the notarized statement was false and that he had signed it because he was angry about having received a 96-month sentence, which he thought was too harsh in light of how much he had assisted the government. Mr. Harper further testified that he had lied in a letter to his Aunt Mary, both when he told her that her son, Mr. Bass, was not involved in dealing crack and when he said that he (Mr. Harper) had lied during the second part of Mr. Bass's pre-trial hearing when he implicated her son in the conspiracy.

Mr. Bass filed a motion for a judgment of acquittal or, in the alternative, for a new trial, contending that the evidence against him was insufficient to support a guilty verdict. The district court granted a new trial based on Mr. Harper's testimony, but we are unsure of the precise legal ground for the court's ruling. In explaining his decision from the bench, the judge adverted to the fact that when the government called Mr. Harper as a trial witness, it was aware that he had admitted to lying in the first part of his testimony at Mr. Bass's pre-trial hearing. The judge further stated that there was a "reasonable likelihood" that the jury "may not have" found Mr. Bass guilty without Mr. Harper's testimony. Finally, after concluding that Mr. Harper's testimony after the pre-trial hearing was "clearly compromised," the court ordered a new trial in which Mr. Harper would not be allowed to testify. In its memorandum and order entered after the hearing, the court stated that Mr. Harper, "one of the primary [government] witnesses," had "substantially changed his testimony concerning crucial issues in this

case on several occasions" and "testified falsely in this case." The district court also questioned in general the reliability of other government witnesses.

## I.

Because the parties expend considerable effort in their briefs on the question of when the government's presentation of perjured testimony at trial can give rise to a constitutional violation, we assume that they think that the district court's order may have rested on a belief that Mr. Bass's trial was constitutionally infirm. It is familiar law that the government may not deliberately present false evidence at trial or allow it to go uncorrected. *See Giglio v. United States*, 405 U.S. 150, 153 (1972). To establish a due process violation based on the prosecutorial use of false testimony, a defendant must show that "(1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." *See United States v. Funchess*, 422 F.3d 698, 701 (8th Cir. 2005), *cert. denied*, 126 S. Ct. 1452 (2006); *United States v. Peterson*, 223 F.3d 756, 763 (8th Cir. 2000).

Even assuming for the sake of argument that Mr. Harper's trial testimony was indeed perjured and that this issue was properly before the district court, Mr. Bass has provided no proof of the second *Funchess* requirement, *i.e.*, that the prosecution knew or should have known of the perjury. While the district court indicated in its ruling on the new trial motion that the government was aware of Mr. Harper's "first set of perjured testimony that occurred in the motion to suppress," the court never unambiguously found that the government should have known or knew that Mr. Harper would offer perjured testimony at trial. And we believe that it would have been clear error to do so, since there was no evidence tending to show any such knowledge on the part of the government. What the government knew, so far as the record shows, was that Mr. Harper had told different stories, not that his second story was untrue. We also note that Mr. Bass's defense counsel knew at least as much as the

government did, if not more, about Mr. Harper's prior inconsistent statements and was able to subject his testimony to cross-examination on each material point. Having decided that the second *Funchess* requirement was not met, we need not address the other requirements. There was thus no basis for concluding that the government violated Mr. Bass's due process rights by presenting Mr. Harper's testimony.

We note that the district court, when granting the new trial, stated that the government should not have offered Mr. Harper's testimony at trial without "further investigation concerning his consistent 'truthfulness,' whatever that may be." But we are not convinced that Mr. Harper's change in testimony at the pre-trial hearing meant that the government had reason to know that he would perjure himself at trial or precluded the government from calling him as a witness without investigating further, particularly since the defendant himself did not object to Mr. Harper testifying at trial and the jury was fully informed of Mr. Harper's previous statements. The government, of course, must often rely on witnesses with a less than impeccable history in order to prosecute criminal activity. *Cf. United States v. Karnes*, 531 F.2d 214, 217 (4th Cir.1976).

## II.

The outcome of Mr. Bass's case remains the same if we assume that the district court's order was based on its belief that the jury's guilty verdict was against the weight of the evidence. A district court's "determination that a new trial should be granted on the ground that the verdict is against the weight of the evidence is entitled to great deference and is reversible only upon a strong showing of abuse." *King v. Davis*, 980 F.2d 1236, 1237 (8th Cir. 1992). But the district court's discretion is abused if it does not take into account a matter that should have been given significant weight, gives significant weight to something improper or irrelevant, or "commits a clear error of judgment." *United States v. Dodd*, 391 F.3d 930, 934 (8th Cir. 2004).

For a verdict to be against the weight of the evidence, the evidence must "preponderate[] sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir.1980). When determining whether the evidence weighs heavily enough against the verdict to have resulted in a miscarriage of justice, the court may make its own credibility determinations. *United States v. Hilliard*, 392 F.3d 981, 987-88 (8th Cir. 2004). Here the district court noted that Mr. Harper's testimony changed not once, but several times, and stated that the witness "clearly has a hard time with the truth." In fact, after reviewing all of the district court's remarks, we believe that it concluded that Mr. Harper had so little regard for the truth that a verdict based on his testimony would be a miscarriage of justice. But we agree with the government that the district court did not give sufficient weight to all of the other evidence supporting the guilty verdict. *See United States v. Johnson*, No. 05-3660, WL 313590, at *5-*6 (Feb. 5, 2007).

Here, aside from Mr. Harper's contested testimony, the government called seven cooperating witnesses who supported the conclusion that Mr. Bass was involved in the crack conspiracy. Six witnesses testified to participating in crack cocaine transactions with Mr. Bass or observing Mr. Bass's crack-related activities. Many of these transactions involved one-half ounce or more of crack, which, according to the government's expert witness, are "dealer amounts, rather than user amounts." Several witnesses explained that Lamar was a member of the 37th Street Crips gang, which engaged in drug dealing, and that Mr. Bass, as his younger brother, associated with the gang members and assisted Lamar by delivering crack cocaine or drug money for him. This evidence is consistent with Officer Gassaway's testimony that Mr. Bass stated that he made deliveries for Lamar. Although the witnesses did not corroborate each other as to specific transactions, they referred to the same locations as places where Mr. Bass and gang members bought, sold, or transferred crack during the relevant time period. A witness described one of these places as a "crack house" where about nine ounces of crack could be found most of the time. According to

several witnesses, Mr. Bass continued to deal in drugs after Lamar was arrested in late 2002.

The only noteworthy piece of information that none of the cooperating witnesses corroborated was that Mr. Bass delivered drugs wrapped in clothing. Rather, several witnesses described how Mr. Bass sold drugs contained in plastic bags. But we see no inherent contradiction given that Mr. Bass may have used both clothing and plastic bags on separate occasions to transport crack cocaine. This does not cast doubt on the witnesses' account of Mr. Bass's frequent involvement in both the sale and acquisition of crack cocaine, at times at his brother Lamar's request but also on his own. In light of this overwhelming evidence, we conclude that it was an abuse of discretion for the district court to have granted a new trial based on the weight of the evidence.

Having found no adequate basis for the district court's order granting a new trial, we reverse that order, reinstate the jury's verdict, and remand this case for sentencing.

_____