**UNITED STATES of America,**
**Plaintiff,**

v.

**Brandon Reeves TYERMAN,**
**Defendant.**

No. 4:09–cr–23.

United States District Court,
S.D. Iowa,
Central Division.

Dec. 20, 2011.

Mary C. Luxa, U.S. Attorney's Office, Des Moines, IA, Richard D. Westphal, United States Attorney's Office, Davenport, IA, for Plaintiff.

Alfredo G. Parrish, Parrish Kruidenier Dunn Boles Gribble Parrish Gentry & Fisher LLP, Des Moines, IA, for Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is Brandon Tyerman's ("Defendant") Motion for Judgment of Acquittal and New Trial ("Def.'s Mot."), filed on October 26, 2011. Clerk's No. 240. Defendant attached a supporting brief to his motion ("Def.'s Br."). Clerk's No. 240-1. The Government filed a response to the motion ("Gov't Resp.") on November 21, 2011. Clerk's No. 247. Defendant filed a reply to the Government's response ("Def.'s Reply") on November 29, 2011. Clerk's No. 249. The matter is fully submitted.

## I. PROCEDURAL BACKGROUND

On February 25, 2009, Defendant was charged with, among other crimes, one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (hereinafter "Count Three"), and one count of possession of a stolen firearm, in violation of 18 U.S.C. § 922(j) (hereinafter "Count Four").[1] Clerk's No. 17. On October 2, 2009, Defendant entered an *Alford*[2] plea on Count Three.[3] Clerk's No. 64. Defendant later attempted to withdraw his plea, but the Court denied his request and sentenced him to 50 months incarceration. *See* Clerk's No. 134. On June 9, 2011, 641 F.3d 936 (8th Cir.2011), the Eighth Circuit Court of Appeals, finding error in the Court's refusal to allow Defendant to withdraw his plea, vacated Defendant's judgment and remanded his case. Clerk's No. 143. Defendant subsequently withdrew his plea, and on October 17, 2011, stood trial on Counts Three and Four. Clerk's Nos. 150, 229. The jury returned guilty verdicts on both Counts. Clerk's No. 235.

At the close of the Government's case-in-chief, and again at the close of all the evidence, Defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *See* Trial Tr.

(Clerk's Nos. 242–44) at 366, 394. The Court denied Defendant's motion. *See id.* at 374, 395. Defendant now renews his motion for judgment of acquittal as to Count Four, claiming the evidence was insufficient to sustain the jury's verdict. *See* Def.'s Mot. ¶ 2. In the alternative, Defendant requests a new trial, pursuant to Federal Rule of Criminal Procedure 33. *See id.* ¶ 3. Defendant claims he is entitled to a new trial because of numerous errors made before and during trial that individually and cumulatively deprived him of a fair trial. *See id.* ¶¶ 4–9.

## II. MOTION FOR JUDGMENT OF ACQUITTAL

### A. *Legal Standard*

■ This Court must enter a judgment of acquittal if the evidence presented at trial is insufficient to sustain a conviction. Fed.R.Crim.P. 29(a); *United States v. Water*, 413 F.3d 812, 816 (8th Cir.2005). "This standard is 'very strict' and a jury's verdict should not be overturned lightly."[4] *United States v. Boesen*, 491 F.3d 852, 855 (8th Cir.2007) (quoting *United States v. Ellefson*, 419 F.3d 859, 862 (8th Cir.2005)). Therefore, "[a] motion for judgment of acquittal should be granted only if there is

1. Defendant was also charged with one count of embezzlement and one count of mail fraud. *See* Clerk's No 17. The Court severed these two counts from the firearms counts and, on February 16, 2010, Defendant stood trial on the embezzlement and mail fraud charges. Clerk's No. 117. The jury returned verdicts of not guilty on both charges. Clerk's No. 125.

2. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

3. Pursuant to the plea agreement, the Court dismissed Count Four at sentencing. *See* Clerk's No. 134.

4. Indeed, to do otherwise would risk displacing the jury as the principal trier of fact, thereby placing the Court in a role the Constitution expressly delegates to the people. In the sage words of a fellow district court, "[T]he jury is an institution of central importance in our system of government, and courts must jealously guard against encroachments on the jury's province. It is the jury to which the founders of this nation turned to fill the role of impartial fact finder. Its primacy is guaranteed by the United States Constitution, and the American jury system is our most vital day-to-day expression of direct democracy." *United States v. Green,* 346 F.Supp.2d 259, 316 (D.Mass.2004), *vacated and remanded on other grounds by United States v. Pacheco,* 434 F.3d 106 (1st Cir.2006).

no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Cacioppo*, 460 F.3d 1012, 1021 (8th Cir.2006); *accord United States v. Moore*, 108 F.3d 878, 881 (8th Cir.1997) (instructing that "[t]he jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt").

■ In considering a motion for judgment of acquittal based on the sufficiency of the evidence presented at trial, the Court must "view the evidence in the light most favorable to the guilty verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence." *United States v. Basile*, 109 F.3d 1304, 1310 (8th Cir.1997). The Court can overturn the jury's verdict only if "a reasonable fact-finder must have entertained a reasonable doubt about the government's proof" on one or more of the essential elements of the crime charged. *United States v. Kinshaw*, 71 F.3d 268, 271 (8th Cir.1995) (quoting *United States v. Nunn*, 940 F.2d 1128, 1131 (8th Cir.1991)). "This standard applies even when the conviction rests entirely on circumstantial evidence." *United States v. Davis*, 103 F.3d 660, 667 (8th Cir.1996). In reviewing the evidence presented to the jury, it is important to note that "[t]he evidence need not exclude every reasonable hypothesis except guilt." *United States v. Baker*, 98 F.3d 330, 338 (8th Cir.1996) (quoting *United States v. Erdman*, 953 F.2d 387, 389 (8th Cir.1992)). Finally, it is not the Court's role to weigh the evidence or assess the credibility of witnesses, as these tasks belong to the jury alone. *See United States v. Ireland*, 62 F.3d 227, 230 (8th Cir.1995) (observing that the jury has the role of judging the credibility of witnesses

and resolving any contradictions in the presented evidence).

### B. *Analysis*

■ To gain a conviction for a violation of 18 U.S.C. § 922(j), the Government must prove beyond a reasonable doubt that:

(1) the defendant knowingly possessed the firearm, (2) the firearm was stolen, (3) the defendant knew or had reasonable cause to believe the firearm was stolen, and (4) the firearm was shipped or transported in interstate commerce either before or after it was stolen.

*United States v. Provost*, 237 F.3d 934, 938 (8th Cir.2001). Defendant does not seriously dispute the sufficiency of the evidence regarding his possession of a firearm, or that the firearm had been shipped in or transported in interstate commerce. *See* Def.'s Mot. ¶ 2; Final Jury Instruction (Clerk's No. 223) No. 14 (stipulating that the firearm was shipped or transported in interstate commerce). Instead, Defendant alleges that there was insufficient evidence to establish the firearm was stolen, or that he knew, or had reasonable cause to believe, that the firearm was stolen. *See* Def.'s Mot. ¶ 2.

#### 1. *Evidence.*

The jury heard from several witnesses regarding a 9 mm black Beretta handgun (hereinafter the "Firearm"). Timothy Yasunaga ("Yasunaga") testified that he owned the Firearm, which he stored in a black plastic carrying case, and kept, along with a box of 9 mm ammunition, in a nightstand drawer. *See* Trial Tr. at 290–93. Yasunaga also testified that Defendant was aware of the Firearm, and that Yasunaga had previously declined Defendant's request to borrow the Firearm. *See id.* at 290. It was further established that Defendant had permission to stay at Yasuna-

ga's home on numerous occasions and that he knew Yasunaga's garage access code. *See id.* at 287–88. Finally, Yasunaga testified that on June 17, 2008, he realized the Firearm, carrying-case, and box of ammunition were all missing. *See id.* at 292. Yasunaga was moving at the time and could not rule out the possibility that the Firearm and associated items had already been packed. *See id.* at 297. Nevertheless, he filed a police report indicating that the Firearm had been stolen. *See id.* at 293. Yasunaga later recovered the Firearm, but not the ammunition or carrying-case. *See id.* He found the Firearm in a heating duct in the basement of his home. *See id.* He had not placed the Firearm in the heating duct. *Id.*

The jury also heard testimony from Roberta Putney, who observed Defendant in possession of a black handgun in the early morning hours of June 5, 2008. *See id.* at 197. Daryn Foley testified that on June 5, 2008, he observed a box of ammunition on the floor of Defendant's truck. *See id.* at 239. This box of ammunition, along with a Beretta carrying-case, was later seized from Defendant's truck by Deputy Aaron Kester. *See id.* at 145–46. Yasunaga testified that the box of ammunition and carrying-case were consistent with the box of ammunition and carrying-case that went missing from his home.[5] *See id.* at 291–92.

### 2. *Relevant Law.*

There is no statutory definition for the term "stolen" in § 922(j). *See* 18 U.S.C. § 921. Defendant argues that, as used in § 922(j), the term "stolen" requires an intent to permanently deprive the firearm owner of ownership. *See* Def.'s Br. at 3

(citing *United States v. McBane*, 433 F.3d 344, 348 (3d Cir.2005)). The Government urges the Court to interpret the term "stolen" as it is used in USSG § 2K2.1 (b)(4), the United States Sentencing Guideline involving possession of a stolen firearm, to mean "all felonious or wrongful takings with the intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *United States v. Bates*, 584 F.3d 1105, 1109 (8th Cir.2009).

■ In federal criminal statutes, the term "stolen" generally does not require an intent to permanently deprive. *See United States v. Van Elsen*, 652 F.3d 955 (8th Cir.2011) ("The Supreme Court and this circuit broadly construe Congress's use in a federal theft statute of the word 'conversion,' and more especially, the word 'steal.' "). The Court is not persuaded by Defendant's citation to *McBane* that Congress intended such an interpretation for the term "stolen" as used in § 922(j). In determining whether a firearm was stolen, the *McBane* court simply considered as a relevant factor that the defendant, who was not the individual who initially took the firearm from its owner, had not tried to return the firearm once he came into possession of it. 433 F.3d at 348. *McBane* contained no discussion of whether the term "stolen" required an intent to permanently deprive.

■ Instead, the Court finds persuasive the broader definition that other courts have consistently applied to the term "stolen" in various federal criminal statutes. *See, e.g., Van Elsen*, 652 F.3d at 962 (find-

---

**5.** Yasunaga testified that the ammunition was a "similar style" to the ammunition he had, but he was not one hundred percent sure that it was the same box of ammunition that went missing from his home. Trial Tr. at 291–92. Yasunaga also testified that the carrying case pictured in Government's Exhibit 4 was "similar in appearance" to the carrying case that he had owned, but that he could not "say for sure" whether it was the exact one based solely on the picture. *Id.* at 291.

ing that "the intent to permanently deprive is neither a required element of, nor a defense to, the "conver[sion]" or "steal[ing]" that 18 U.S.C. § 664 criminalizes") (brackets in original); *United States v. Jackson*, 401 F.3d 747, 749–50 (6th Cir. 2005) (holding that intent to permanently deprive in not required to conclude that a firearm is "stolen" in the context of USSG § 2K2.1);[6] *United States v. Herrman*, No. 96–3076, 1996 WL 621028, at *1 (10th Cir. Oct. 28, 1996) (same); *Schwab v. United States*, 327 F.2d 11, 14 (8th Cir.1964) (determining that certain property was "stolen" in the context of the Dwyer Act (current version codified at 18 U.S.C. § 2312), noting "while the defendants may not have formed a specific intent to permanently deprive the owner of his property, they did intend to deprive him of his property for so long as it suited their purposes"); *United States v. Turley*, 352 U.S. 407, 417, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957) (finding the Dwyer Act "requires an interpretation of 'stolen' which does not limit it to situations which at common law would be considered larceny"). "Unless Congress states otherwise, we do not discern, through Congress's deployment of [the word "stolen"], a Congressional intent to proscribe only larcenous thefts infused with the malefactor's intent to permanently deprive the victim of his or her property." *Van Elsen*, 652 F.3d at 961. The Court is aware of no indication that Congress intended the term "stolen," as used in § 922(j), to include an intent to permanently deprive; the Court will not add such a requirement on its own initiative.

### 3. *Application.*

 Defendant contends that there was insufficient evidence to establish the firearm he possessed was stolen, and that he knew, or had reasonable cause to believe, the firearm was stolen. *See* Def.'s Mot. ¶ 2. However, the evidence established that: 1) Yasunaga owned a Firearm; 2) Defendant was aware of, and had access to, the Firearm, 3) Yasunaga denied Defendant's request to take the Firearm; 4) Defendant was seen with a black handgun on June 5, 2008; 5) other items that appeared to be associated with the Firearm—namely a box of 9 mm ammunition and a Beretta carrying case—were found in Defendant's car on June 5, 2008; 6) on June 17, 2008, Yasunaga noticed the Firearm, along with his box of ammunition and carrying case were missing; and 7) Yasunaga later found the Firearm in a location that he did not put it—a heating duct in the basement of his home. A reasonable inference from this evidence is that Defendant took the Firearm without Yasunaga's consent or knowledge. This is sufficient to establish that the Firearm was stolen.[7]

---

**6.** Defendant argues that the Court should not rely on the definition of "stolen" as used in U.S.S.G. § 2K2.1(b)(4) because the application of that guideline does not require that a defendant have the same mental state required by § 922(j), i.e., that the defendant "knew or had reason to believe the firearm was stolen." Def.'s Reply at 3 (quoting *Bates*, 584 F.3d at 1108). The Court does not agree. The mental state to which Defendant refers is a separate element that the Government must prove to establish a violation under § 922(j). That U.S.S.G. § 2K2.1(b)(4) does not require this mental state is not relevant to whether

the term "stolen" incorporates its own mental state—the intent to permanently deprive.

**7.** Even had the Court adopted the definition of "stolen" advanced by Defendant, the evidence was sufficient to show that he intended to permanently deprive Yasunaga of ownership of the firearm. Defendant argues that, under this definition, the evidence was insufficient because Defendant "restored it to the owner so there is no evidence Tyerman possessed the firearm with intent to deprive Yasunaga of the rights and benefits of ownership of the firearm." Def.'s Reply at 2. However, the evidence did not show that Defendant

*Cf. Van Elsen,* 652 F.3d at 961 (noting property is "stolen" when thieves "deprive [the owner] of his property for so long as it suited their purposes") (quoting *Schwab,* 327 F.2d at 13); *Jackson,* 401 F.3d at 750 ("[T]he Oxford English Dictionary's definition of 'steal,' is '[t]o take dishonestly or secretly.'").

 As for Defendant's knowledge or reasonable belief that the firearm was stolen, "[k]nowledge may be proven by circumstantial evidence alone; it frequently cannot be proven in any other way." *United States v. Garcia,* 521 F.3d 898, 901 (8th Cir.2008) (quoting *Erdman,* 953 F.2d at 390). Here, Defendant had previously asked to borrow the Firearm, and Yasunaga had denied this request. The jury could reasonably infer from this that Defendant knew he did not have permission to take the Firearm and, thus, knew that when he took the Firearm, it was stolen. Accordingly, the evidence was sufficient to sustain Defendant's conviction on Count Four.

### III. MOTION FOR NEW TRIAL

#### A. *Legal Standard*

 Federal Rule of Criminal Procedure 33 provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The district court is granted broad discretion in passing upon motions for new trial, and its decision is subject to reversal only for a clear abuse of discretion. *See United States v. Bass,* 478 F.3d 948, 951 (8th Cir.2007) (quoting *King v. Davis,* 980 F.2d 1236, 1237 (8th Cir.1992)). Unlike a motion for judgment of acquittal, the Court need not view the evidence in the light most favorable to the government when considering a motion for a new trial. Rather, in assessing whether Defendant is entitled to a new trial on the ground that the verdict is contrary to the weight of the evidence, "the district court weighs the evidence and evaluates anew the credibility of the witnesses to determine if a miscarriage of justice may have occurred." *Davis,* 103 F.3d at 668; *United States v. Lanier,* 838 F.2d 281, 284–85 (8th Cir.1988) (per curiam). As the Eighth Circuit Court of Appeals explained in *United States v. Rodriguez:*

> "When a motion for a new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different from those raised by a motion for judgment of acquittal. The question is whether he is entitled to a new trial. In assessing the defendant's right to a new trial, the court must weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." *United States v. Lincoln,* 630 F.2d [1313] 1316 [ (8th Cir.1980) ]. The court will only set aside the verdict if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred. We will not reverse the district court's decision absent a clear and manifest abuse of discretion. *United States v. Bonadonna,*

returned the Firearm to Yasunaga, only that Yasunaga later found it in a location that he did not place it—a heating duct in his basement. *See* Trial Tr. at 293. While a jury *could* infer that Defendant placed the Firearm there with the intent to return it to Yasunaga, it *could* also reach a number of other reasonable conclusions, including that Defendant hid the Firearm with the intent to return for it himself, or with the intent that it remain hidden forever. In any event, the Court's job in evaluating a Rule 29 motion is not to determine whether there is any reasonable interpretation of the evidence that does not support the jury's verdict; it is just the opposite. *See Cacioppo,* 460 F.3d at 1021. A reasonable interpretation of the evidence is that Defendant took the Firearm with the intent to permanently deprive Yasunaga of its ownership.

775 F.2d 949, 957 (8th Cir.1985); *United States v. Ferguson*, 776 F.2d 217, 225 (8th Cir.1985); *United States v. Bohn*, 508 F.2d 1145, 1150 (8th Cir.1975). 812 F.2d 414, 417 (8th Cir.1987).

■■■ The Eighth Circuit has also warned that the authority to grant a Rule 33 motion for new trial "should be used sparingly and with caution." *Lincoln*, 630 F.2d at 1319. The mere fact that the "government's case is based upon circumstantial evidence does not by itself necessitate a new trial," nor does the fact that a defendant can point to "credibility problems" in some of the government's witnesses. *United States v. Davis*, 534 F.3d 903, 913 (8th Cir.2008). The district court's discretion in determining that a new trial is warranted "is abused if it does not take into account a matter that should have been given significant weight, gives significant weight to something improper or irrelevant, or 'commits a clear error of judgment.'" *Bass*, 478 F.3d at 951 (quoting *United States v. Dodd*, 391 F.3d 930, 934 (8th Cir.2004)).

### B. *Analysis*

Defendant argues he is entitled to a new trial in the interest of justice because of four errors that occurred either prior to or during trial. Def.'s Mot. ¶¶ 5–9. Defendant first complains that two of the Court's pretrial rulings were in error: 1) the Court's refusal to exclude evidence related to the Firearm (hereinafter the "Firearm Evidence")[8] that Defendant claims was obtained in violation of his Fifth and Sixth Amendment rights; and 2) the Court's refusal to exclude, pursuant to Federal Rule of Evidence 404(b), evidence of prior altercations and disputes between Defendant and his ex-wife ("Collins"). Defendant next argues that certain statements by Gary Mumford ("Mumford"), a Government witness, were improper because they addressed an issue that the Court had ordered excluded from trial, addressed otherwise inadmissible evidence, and were unfairly prejudicial. Finally, Defendant argues that the Court erred in failing to instruct the jury that they could draw an adverse inference against the Government based on the Government's negligent destruction of the Firearm. Defendant claims that he is entitled to a new trial because these errors, both individually and cumulatively, deprived him of a fair trial. The Court will address each argument in turn.

### 1. *Pretrial rulings.*

■■■ Erroneous evidentiary rulings can be the basis for a new trial if the rulings affected a defendant's substantial rights or had more than a slight influence on the verdict. *See United States v. Honken*, 381 F.Supp.2d 936, 1005 (N.D.Iowa 2005) (citing *United States v. Mack*, 343 F.3d 929 (8th Cir.2003) and *United States v. Crenshaw*, 359 F.3d 977, 1003 (8th Cir.2004)). Here, the evidentiary rulings that Defendant complains of were fully litigated prior to trial. *See* Order denying Def.'s Mot. to Suppress (Clerk's No. 43); Bench Ruling on Def.'s Second Mot. in Limine (Clerk's No. 61); Order Denying Reconsideration of Def.'s Second Mot. in Limine (Clerk's No. 198). Defendant has not raised additional arguments as to how the Court's specific rulings were in error, but instead

---

8. Defendant originally sought to suppress the Firearm. *See* Def.'s Mot. to Suppress (Clerk's No. 29). However, the Firearm was never presented at trial because it was negligently destroyed prior to trial by the Government. *See* Order Denying Mot. to Dismiss (Clerk's No. 193) at 7. At trial, the Government entered pictures of the Firearm and elicited testimony about where Yasunaga ultimately located the Firearm. This is the specific evidence to which the term "Firearm Evidence" refers.

makes the same objections that were raised in his pretrial motions. After reviewing the record, the Court finds no material error in these rulings and, thus, will provide only a brief summary of the issues.

### a. *The Firearm Evidence.*

Defendant was tried and convicted by the State of Iowa on charges that stemmed from the same set of facts involved in this case. *See State v. Tyerman,* No. 09–0113, 2010 WL 787935 (Iowa Ct.App. Mar. 10, 2010). While Defendant was in state custody awaiting his bond hearing, the Government obtained the Firearm from Defendant's then-attorney, Peter Berger ("Berger"). *See* Order Denying Def.'s Mot. to Suppress at 2. Berger, after learning from Defendant that the Firearm was in a heating duct in Yasunaga's basement, contacted Yasunaga and had him bring the Firearm to Berger. *See id.* Berger then turned the Firearm over to the police in the hopes of reducing Defendant's state bond. *See id.* Defendant subsequently fired Berger, accusing him of violating the attorney-client privilege. *See id.*

 Once indicted on federal charges, Defendant moved to suppress the Firearm, claiming that the Government obtained it in violation of his Sixth Amendment rights, and that a trial involving the Firearm would violate his Fifth Amendment rights. The Court found that Defendant's Sixth Amendment rights were not violated because, even assuming Berger's disclosure amounted to a breach of the attorney-client relationship,[9] the Government did not knowingly intrude on the attorney-client relationship; rather it was a passive recipient of the Firearm Evidence. *See id.* at 4–5 (citing *United States v. Singer,* 785

F.2d 228, 234 (8th Cir.1986) ("To establish a sixth amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant ....") (internal citations omitted)). The Court similarly found that Defendant's Fifth Amendment due process rights were not violated because the Government did not intentionally intrude upon the attorney-client relationship. *See id.* at 5–6. Accordingly, the Court denied Defendant's suppression motion. However, based in part on a stipulation by the parties, the Court prohibited the introduction of specific statements that Defendant had made to Berger regarding the location of the Firearm, as well as any testimony about how Yasunaga learned the Firearm was in a heating duct in his basement. *See* Oct. 1, 2009 Hr'g Tr. (Clerk's No. 66) at 4–5. The result of these rulings was that the Government was able to present the Firearm Evidence, but not testimony about how Yasunaga learned that the Firearm was in a heating duct in his basement.

Defendant now renews his challenge, claiming his Fifth Amendment right to due process and his Sixth Amendment right to counsel were violated by Berger's unauthorized disclosure of the Firearm and the Government's subsequent use of the Firearm Evidence. *See* Def.'s Br. at 6. However, as Defendant has raised no new arguments as to how Berger's disclosure violated his Fifth or Sixth Amendment rights, the Court finds, for the reasons stated more thoroughly in its previous order, that no such violations occurred. *See* Order Denying Def.'s Mot.

---

9. The Government contends that this was not an unauthorized disclosure because Defendant waived the attorney-client privilege. *See*

Gov't Resp. at 7–8. It is not necessary for the Court to address this argument.

to Suppress at 4–6. Thus, Defendant is not entitled to a new trial on this basis.

### b. *Alleged 404(b) evidence.*

Prior to trial, Defendant also moved to exclude, pursuant to Federal Rule of Evidence 404(b), the following: 1) evidence of marital discord between Defendant and Collins-including a death threat he made against her in December 2007; 2) an April 28, 2008 physical altercation between Defendant and Collins, during which Defendant again threatened her life; and 3) Defendant's numerous violations of a no-contact order that Collins had against him, including several instances where he trespassed on her parent's farm—the property where she was living at that time. *See* Def.'s Second Mot. in Limine (Clerk's No. 55) ¶¶ 4–6. The Court denied Defendant's motion, ruling the evidence was admissible either to show Defendant's motive, or as *res gestae* evidence. *See* Oct. 1, 2009 Hr'g Tr. at 8 (citing *United States v. Forcelle*, 86 F.3d 838, 841 (8th Cir.1996)). Defendant now argues the admission of this evidence deprived him of a fair trial.

After observing the trial, the Court is confident that this testimony was properly admitted to establish Defendant's motive.[10] "In determining whether evidence is admissible under Rule 404(b), we ask whether the evidence is (1) 'relevant to a material issue'; (2) 'similar in kind and not overly remote in time to the crime charged'; (3) 'supported by sufficient evidence'; and (4) 'its potential prejudice does not substantially outweigh its probative value.'" *United States v. Wilson*, 619

F.3d 787, 792 (8th Cir.2010) (quoting *United States v. Donnell*, 596 F.3d 913, 921 (8th Cir.2010)). The evidence of Defendant's relationship with Collins was relevant to explain Defendant's actions on the morning of June 5, 2008. Specifically, evidence of the volatile nature of their relationship, including Defendant's expressed desire to kill Collins, explained why he would be driving through a field next to her parents' home in the early morning hours of June 5, 2008, with a firearm and ammunition. Further, the evidence was sufficiently supported by Collins' testimony. *See* Trial Tr. at 36–55. While the evidence may not have been particularly similar in kind, this factor is less significant given that the evidence was offered to show motive. *See United States v. Farish*, 535 F.3d 815, 820 n. 1 (8th Cir.2008) ("While domestic abuse is not 'similar in kind' to arson, we do not consider the similar-in-kind requirement to be as significant when the evidence is admitted to show motive as it might otherwise be if the evidence was admitted to show intent or knowledge, for instance."). Finally, given the significant probative value of this evidence, the danger for unfair prejudice did not substantially outweigh the probative value of this evidence.[11] Accordingly, Defendant is not entitled to a new trial on this basis.

### 2. *Testimony from Gary Mumford.*

### a. *Facts.*

Prior to trial, the Government indicated it intended to call Mumford, Defendant's fellow inmate, to testify about inculpatory

---

**10.** Accordingly, the Court has no occasion to revisit its pretrial determination that the evidence may also qualify as *res gestae* evidence.

**11.** During the October 1, 2009 hearing, the parties discussed the possibility of a limiting instruction regarding this evidence. However, aside from a general reference to Eighth

Circuit Model Instruction 2.08 (Defendant's Prior Similar Acts) in Defendant's proposed jury instructions (Clerk's No. 173), Defendant made no request that a limiting instruction be given during trial nor did he object that one was not included in the final jury instructions. Thus, no limiting instruction was given.

statements that Defendant made regarding the June 5, 2008 incident, as well as Defendant's alleged desire to have Mumford hire someone to kill Collins prior to Defendant's trial. Defendant moved to exclude any testimony from Mumford, claiming, among other things, it was irrelevant and unfairly prejudicial. *See* Def.'s Fourth Mot. in Limine (Clerk's No. 209). The Court ruled that Mumford could not testify about the alleged murder-for-hire plot, but could testify about incriminating statements Defendant had made regarding the June 5, 2008 incident. *See* Order Granting in Part Def.'s Fourth Mot. in Limine (Clerk's No. 226) at 2–4; Trial Tr. at 6–9. Prior to testifying, Mumford was admonished by counsel for the Government that he was not to reference in any fashion Defendant's statements about wanting to hire someone to kill Collins. *See* Trial Tr. at 303–04.

During cross-examination, Mumford was asked about the color of his prison uniform, and testified as follows:

Q. What's the orange for?

A. I think it has something to do with my charge.

Q. What does that mean?

A. A weapon.

Q. So if you're wearing orange, it means that you might be violent?

A. It's the same one that Brandon had on.

*Id.* at 321.

Also during Mumford's cross-examination, he was asked about cooperating with the Government, and testified as follows:

Q. So I would imagine that you would have some incentive to want to get out and spend some time outside of prison.

A. I think anyone would.

Q. Okay. That would be pretty important to you?

A. An incentive?

Q. Yes. That would be pretty important to you?

A. My incentive—are you talking about my incentive for cooperating with the Government? My initial thing was I went to my attorney because of what he had asked me to do.

*Id.* at 338–39.

Defendant now claims that he is entitled to a new trial because Mumford "improperly and without solicitation testified to evidence he was told not to mention" and similarly "testified he was wearing a striped orange jump suit, which is the same color suit that [Defendant] wears in jail." Def.'s Mot. ¶¶ 6–7.

b. *Relevant law.*

Despite his concession that the "prosecutor was not guilty of 'prosecutorial misconduct'" Defendant argues that "the factors used to evaluate such claims can be used to evaluate Mumford's prejudicial statements." Def.'s Br. at 8. Thus, Defendant claims the Court should evaluate whether a new trial is warranted by considering whether: "(1) the [witness'] remarks [were] improper, and (2) the remarks prejudicially affect[ed] the defendant's substantial rights as to deprive the defendant of a fair trial." *Id.* (citing *United States v. Beeks,* 224 F.3d 741, 746 (8th Cir.2000)). Defendant further claims that the relevant factors in determining whether he was deprived of a fair trial are: "(1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) the curative actions taken by the district court." *Id.* (citing *Beeks,* 224 F.3d at 746).

■ The Government argues that the appropriate legal standard is that used to evaluate improper testimony. *See* Gov't Resp. at 12. "The prejudicial effect of any improper testimony is determined by examining the context of the error and the strength of the evidence of the defendant's guilt." *United States v. Smith*, 487 F.3d 618, 622 (8th Cir.2007) (quoting *United States v. Hollins*, 432 F.3d 809, 812 (8th Cir.2005)). Although the Court is dubious of any practical difference between these two standards, because there was no misconduct by the prosecutor, the Court agrees that the proper legal standard is that advocated by the Government. Accordingly, the Court must evaluate the prejudicial effects of Mumford's improper testimony by examining its context and the overall strength of the evidence of Defendant's guilt.

### c. *Application.*

■ Defendant argues that Mumford's first statement, that Defendant wore the same orange colored jail-uniform as Mumford did, brought to the jury's attention that Defendant had a propensity for violence and improperly highlighted Defendant's criminal background. *See* Def.'s Br. at 7. The Court does not agree. Mumford's statement was preceded by his testimony that orange represented that an individual had been charged with a weapon-related crime. *See* Trial Tr. at 321. That Defendant had been charged with a weapons-related crime was no secret; it was the purpose of the trial. To the extent that this statement may have suggested

that Defendant was violent,[12] the statement was so vague and indirect that any resulting prejudice was minimal. *See United States v. Triplett*, 195 F.3d 990, 997 (8th Cir.1999) (finding prejudice caused by a vague and indirect reference to a defendant's post-arrest silence minimal). Viewed in light of the evidence presented by the Government, including eyewitness testimony that Defendant possessed a firearm, and strong circumstantial evidence indicating that the firearm was stolen, the Court finds that whatever minimal prejudice resulted from this isolated statement is not sufficient to warrant a new trial. *See United States v. Garrett*, 648 F.3d 618, 624–25 (8th Cir.2011) (finding that improper testimony did not warrant a mistrial where "it was an isolated comment from one witness in the midst of testimony from twelve other witnesses"); *United States v. Cole*, 380 F.3d 422, 427 (8th Cir.2004) ("In the face of the strong evidence and wide array of testimony against [the defendant], one objectionable statement by a prosecution witness was not sufficient to create prejudicial error.").

■ As for Mumford's second statement, "I went to my attorney because of what he had asked me to do," Defendant argues that this was prejudicial because it referenced evidence that the Court had already excluded—Defendant's request that Mumford hire someone to kill Collins. Again, the Court disagrees about the impact of this testimony on the jury. Mumford's statement was, at best, a vague ref-

12. Mumford's statement, "It's the same one that Brandon had on," was in response to the question: "So if you're wearing orange, it means that you might be violent?" Mumford's answer was non-responsive. It did not address whether or not orange was related in any way to violence. Considering Mumford's answer immediately preceding this question was that orange signified a weapon charge, it

is unlikely that the jury interpreted Mumford's testimony to mean that an orange prison outfit signified violence rather than a weapon-related charge. This is particularly true because the jury was instructed on two occasions that evidence does not include statements made by the lawyers. *See* Preliminary Jury Instruction No. 8 (Clerk's No. 253); Final Jury Instruction No. 3.

erence to the evidence that he had been admonished not to discuss. However, because the jury had never heard—and thus was unaware—that Defendant had asked Mumford to hire someone to kill Collins, the jury would not understand that this vague statement was referencing a murder-for-hire plot. Moreover, Mumford's statement was preceded by a lengthy discussion of the charges that he was facing, and the legal effect that cooperating with the Government would have on his sentence. During this discussion there were numerous references to Mumford's attorney, but no references to Defendant. *See* Trial Tr. 330–39. Considering the extended conversation of Mumford's legal predicament, and the reference to Mumford's lawyer directly preceding the phrase "what he asked me to do," the jury most likely believed that the "he" Mumford was referring to was his attorney, not Defendant. Examining the context surrounding this statement, the Court finds it unlikely that it caused any prejudice. To the extent that it did, in light of the otherwise strong evidence of guilt, this prejudice is not sufficient to warrant a new trial.

### 4. *Adverse-inference jury instruction.*

#### a. *Facts.*

After Defendant was initially sentenced, but before his conviction was reversed on appeal, the Government negligently destroyed some of the evidence in this case. *See* Order Denying Def.'s Mot. to Dismiss (Clerk's No. 193) at 3. Among the items destroyed were the Firearm, an ammunition clip, and the Firearm carrying case. *See id.* Based on this destruction, Defendant requested that the Court instruct the jury as follows:

Evidence has been presentenced the Government has intentionally destroyed evidence, specifically, a 9mm Beretta handgun, model 92FS, serial number BER056350; an ammunition magazine for the handgun; and a case for the handgun. If you find that this evidence existed and the Government knowingly and intentionally destroyed this evidence, you may but are not required to conclude that this evidence would have been adverse or unfavorable to the Government and supportive or favorable to Mr. Tyerman.

Def.'s Proposed Jury Instruction: Destruction of Evidence at 1 (Clerk's No. 171) (errors in original).

The Court declined to give the instruction, finding that it was not appropriate based on the Court's earlier finding that the evidence was destroyed negligently rather than in bad faith. *See* Trial Tr. at 383–84, 390–91. The Court further reasoned that, were it to give Defendant's requested instruction, it would have to provide the Government the opportunity to rebut the permissive inference. *See id.* at 390–91. The Court found this would not only confuse the jury, but require the admission of evidence—namely, the complicated procedural posture of this case—that Defendant had already successfully moved to exclude from trial. *See id.; see also* Order Granting Def.'s Mot. in Limine Regarding Guilty Plea and Appeal (Clerk's No. 226). Defendant now argues that "regardless of the good or bad faith of the [G]overnment, [an adverse-inference] instruction was warranted based on the intentional destruction of evidence." Def.'s Br. at 11 (citing *Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir.2008); *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266–67 (8th Cir.1993); *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir.2004)).

#### b. *Relevant law.*

■ Other circuits may permit an adverse inference jury instruction in certain cases where evidence is negligently de-

stroyed. *See Buckley*, 538 F.3d at 323 (finding an adverse-inference instruction could be appropriate where conduct was intentional but not in bad faith); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir.2002) ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence. . . ."). However, in the Eighth Circuit, a court must make a finding of "intentional destruction indicating a desire to suppress the truth" before it issues an adverse-inference instruction. *Stevenson*, 354 F.3d at 746. In fact, the Eighth Circuit has "never approved of giving an adverse inference instruction on the basis of negligence alone." [13] *Id.* at 747.

### c. *Application.*

■ The Court found that the Government's destruction of the Firearm was the result of negligence and did not indicate a desire to suppress the truth. See Order Denying Def.'s Mot. to Dismiss at 7. Thus, it would have been error for the Court to issue an adverse-inference instruction. *See Stevenson*, 354 F.3d at 746.

■ Furthermore, even if the Court *could* have issued an adverse-inference jury instruction, it would have had "broad discretion" in determining whether doing so would have been appropriate. *See Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir.2010). To determine whether an adverse-inference instruction is appropriate, courts examine the extent to which the destruction of evidence prejudiced the spoliator's adversary. *See id.* (upholding a district court's decision to issue an adverse-inference instruction because the district court had made a finding that the defendant had "severely compromised" the plaintiff's case through its destruction of "crucial" evidence). Here, it is difficult to see how the destruction of the Firearm prejudiced Defendant considering that he previously moved to exclude from trial the very same Firearm. *See* Def.'s Mot. to Suppress. Also, despite the destruction of the Firearm, the jury still heard evidence that Defendant's fingerprints were not found on any of the destroyed pieces of evidence. Trial Tr. at 255–62. Furthermore, in closing arguments, Defendant emphasized the fact that the Firearm no longer exists [14] and argued

**13.** Defendant cites *Dillon*, 986 F.2d at 266–67, and *Stevenson*, 354 F.3d at 746, to support his claim that an adverse-inference instruction is appropriate absent bad-faith. *See* Def.'s Br. at 11. *Dillon* held that it was not plain error to give a permissive adverse-inference instruction when evidence was negligently destroyed. 986 F.2d at 266–67. And, while *Stevenson* does state that "a finding of bad faith is not always necessary to the court's exercise of its inherent power to impose sanctions[,]" 354 F.3d at 745, it goes on to specifically require a finding of bad faith in order to justify an adverse-inference jury instruction, *id.* at 746 (holding "there must be a finding of intentional destruction indicating a desire to suppress the truth" to give an adverse-inference instruction). *Stevenson* goes on to clarify the apparent conflict between this holding and *Dillon*, stating, "[w]e did not discuss in *Dillon* whether a finding of bad

faith or intentional destruction was necessary to impose the specific sanction of an adverse inference instruction. We considered the instruction issue only on plain error review. Thus, *Dillon* is not controlling on this issue." *Id.* at 747 n. 2 (internal citations omitted). Accordingly, neither of these cases support Defendant's proposition that an adverse-inference instruction is proper when evidence is negligently destroyed.

**14.** The jury was instructed as follows regarding the destruction of the Firearm:

Throughout the trial there has been evidence about a firearm that Brandon Tyerman is alleged to have possessed on or about June 5, 2008. That firearm no longer exists.

The Government is not required to produce the actual firearm that Brandon Tyerman is alleged to have possessed in order to

that the Firearm's absence at trial should have created reasonable doubt as to whether the Government had met its burden at trial. *Id.* at 407, 409, 411, 416. Thus, the Court finds that Tyerman was not significantly prejudiced by the destruction of the handgun; hence, no adverse-inference instruction would have been appropriate in this case even if the Court had the discretion to issue such an instruction.

Finally, had the Court issued Defendant's requested adverse-inference instruction, it would have been required to afford the Government an opportunity to present reasonable rebuttal testimony. *See Stevenson,* 354 F.3d at 750. "Absent this opportunity, the jury is deprived of sufficient information on which to base a rational decision of whether to apply the adverse inference...." *Id.* This would have required testimony from the Bureau of Alcohol, Tobacco, Firearms and Explosives agents who destroyed the evidence, and explanation of their mistaken belief that the gun was no longer needed due to Defendant's initial *Alford* plea and corresponding appeal. As previously noted, the Court excluded, at Defendant's request, all evidence relating to Defendant's *Alford* plea and appeal because this evidence presented a danger of unfair prejudice and risked confusing the jury. *See* Order Granting in Part Def.'s Mot. in Limine Regarding Guilty Plea and Appeal at 1–2. Thus, any prejudice that would have been remedied by Defendant's proposed adverse-inference instruction would likely have been offset by the introduction of other evidence that Defendant acknowledged as prejudicial to his case.

For these reasons, the Court finds that it did not err in refusing to give Defendant's requested instructions and, thus, Defendant is not entitled to a new trial.

### 5. *Cumulative effect of errors.*

 Defendant argues that, "[r]egardless of the strength of the evidence, based on the individual and/or cumulative effect of the errors above, the court should grant Tyerman a new trial on both offenses." Def.'s Mot. ¶ 9. A court may grant a new trial "where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal." *United States v. Montgomery,* 635 F.3d 1074, 1099 (8th Cir.2011) (quoting *United States v. Samples,* 456 F.3d 875, 887 (8th Cir.2006)). However, as discussed *supra,* the Court finds that the majority of the errors alleged by Defendant were not, in fact, errors. To the extent that they were, the resulting prejudice against Defendant was minimal, and not sufficient to warrant a new trial.

## IV. CONCLUSION

For the reasons discussed above, Defendant's Motion for Acquittal and a New Trial (Clerk's No. 240) is DENIED.

IT IS SO ORDERED.

---

satisfy its burden of proof on Count Three or Count Four. However, the fact that the firearm no longer exists does not somehow change the burden of proof that the Government has on either Count.

As you have previously been instructed, in order for you to find the Defendant guilty

of either Count, you must find that the Government has proven all of the essential elements of that Count beyond a reasonable doubt; otherwise you must find the Defendant not guilty of that Count.

Final Jury Instruction No. 17.